Paul Q. Goyette (SBN 137250)
Janelle F. Crandell (SBN 224994)
**GOYETTE, RUANO & THOMPSON, INC.**
**A Professional Law Corporation**
2366 Gold Meadow Way, Suite 200
Gold River, CA 95670
Ph: (916) 851-1900
Fax: (916) 851-1995
Email: Paul@grtlaw.com

Attorneys for Defendant,
MORTEZA AMIRI
(Case No. 23-CR-00269-JSW)

TIMOTHY P. CRUDO (State Bar No. 143835)
RACHEL R. SUHR (State Bar No. 323531)
OLIVER W. HAMILTON (State Bar No. 340054)
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104-5500
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email:    ef-tpc@cpdb.com
          ef-rrs@cpdb.com
          ef-owh@cpdb.com

Attorneys for Defendant
MORTEZA AMIRI
(Case No. 23-CR-00264-JSW)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MORTEZA AMIRI,<br><br>Defendant. | Case No. 23-CR-00269-JSW;<br>Case No. 23-CR-00264-JSW<br><br>**DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM; EXHIBITS IN SUPPORT**<br><br>DATE: June 24, 2025<br>TIME: 1:00 PM<br>Before the Honorable Jeffrey S. White, Senior United States District Judge. |

---

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 3

    A.  Mr. Amiri's Upbringing Instilled in Him a Lifelong Identity of Selflessness and Service, Including a Dream to Serve His Community as a Police Officer ................................................................................................ 3

    B.  Mr. Amiri's Challenging Experiences as a Law Enforcement Officer in a High-Crime Jurisdiction Resulted in PTSD and Struggles with Alcohol ..... 12

    C.  The Offense Conduct ................................................................................ 14

        1.  269 Case (Use of Force) ................................................................. 14

        2.  264 Case (Wire Fraud) ................................................................... 15

III.  ARGUMENT ................................................................................................... 18

    A.  Probation Miscalculated Mr. Amiri's Offense Level .................................. 18

        1.  Four-Level Enhancement Under U.S.S.G. § 2A2.2(b)(2)(B) (Dangerous Weapon) Should Not Apply ......................................... 19

        2.  Three-Level Enhancement Under § 2A2.2(b)(3)(A) (Bodily Injury) Should Not Apply ......................................................................... 20

        3.  Six-Level Enhancement Under § 2H1.1(b)(1) (Color of Law) Should Not Apply ..................................................................................... 21

        4.  Mr. Amiri Should Receive an Acceptance-of-Responsibility Reduction ....................................................................................... 22

    B.  The Section 3553(a) Factors Support a Sentence Substantially Below the Advisory Guidelines Range ...................................................................... 25

        1.  Mr. Amiri's History of Service & Generosity Support a Below-Guidelines Sentence ..................................................................... 25

        2.  Mr. Amiri's PTSD & Struggles with Alcohol, as a Result of Significant Workplace Stressors, Support a Below-Guidelines Sentence ....................................................................................... 25

        3.  A Guidelines Sentence Is Not Necessary to Achieve Just Punishment ..................................................................................... 26

        4.  A Guidelines Sentence Is Not Necessary to Protect the Public or for Specific Deterrence. ........................................................................ 34

IV.  CONCLUSION ................................................................................................ 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**<u>Cases</u>**

*Aery v. Nohre,*
   688 F. Supp. 3d 862 (D. Minn. 2023) ........................................................................20

*Apprendi v. New Jersey,*
   530 U.S. 466 (2000) ....................................................................................................19

*Gall v. United States,*
   552 U.S. 38 (2007) ........................................................................................................1

*Kimbrough v. United States,*
   552 U.S. 85 (2007) ..................................................................................................1, 23

*Koon v. United States,*
   518 U.S. 81 (1996) ......................................................................................................33

*Nelson v. United States,*
   555 U.S. 350 (2009) ......................................................................................................1

*Pepper v. United States,*
   562 U.S. 476 (2011) ......................................................................................................1

*United States v. Abraham,*
   498 F. Supp. 3d 175 (D. Mass. 2020) ..................................................................23, 24

*United States v. Adelson,*
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................................25

*United States v. Beltran-Moreno,*
   556 F.3d 913 (9th Cir. 2009) ........................................................................................1

*United States v. Booker,*
   543 U.S. 220 (2005) ....................................................................................................19

*United States v. Boyer,*
   275 Fed. App'x 655 (9th Cir. 2008) ..............................................................................1

*United States v. Britt,*
   27 F. App'x 862 (9th Cir. 2001) ..................................................................................28

*United States v. Carty,*
   520 F.3d 984 (2008) ......................................................................................................1

*United States v. Dayea,*
   32 F.3d 1377 (9th Cir. 1994) ......................................................................................20

*United States v. Gupta,*
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ....................................................................1, 25

*United States v. Harrington,*
   946 F.3d 485 (9th Cir. 2019) ......................................................................................22

*United States v. Hornbuckle,*
   784 F.3d 549 (9th Cir. 2015) ................................................................................21, 22

*United States v. Narte*,
   197 F.3d 959 (9th Cir. 1999) ..................................................................................22

*United States v. Nesbeth*,
   188 F.Supp.3d 179 (E.D.N.Y. 2016) .......................................................................34

*United States v. Oliver*,
   608 F. Supp. 3d 1113 (M.D. Ala. 2022) .................................................................26

*United States v. Pauley*,
   511 F.3d 468 (4th Cir. 2007) ....................................................................................2

*United States v. Redemann*,
   295 F.Supp.2d 887 (E.D. Wis. 2003) ......................................................................29

*United States v. Reese*,
   2 F.3d 870 (9th Cir. 1993) ......................................................................................22

*United States v. Ruff*,
   535 F.3d 999 (9th Cir. 2008) ....................................................................................2

*United States v. Smith*,
   719 F.3d 1120 (9th Cir. 2013) .................................................................................21

*United States v. Tavberidze*,
   2025 WL 748354 (S.D.N.Y. Mar. 10, 2025) ..........................................................23

*United States v. Tzoc-Sierra*,
   387 F.3d 978 (9th Cir. 2004) ...................................................................................32

*United States v. Vigil*,
   476 F. Supp. 2d 1231 (D.N.M. 2007) .....................................................................28

**Statutes**
18 U.S.C. § 242 .............................................................................................................21, 22
18 U.S.C. § 3553(a) .............................................................................................1, 2, 22, 25
18 U.S.C. § 3553(a)(1) ..............................................................................................14, 25
18 U.S.C. § 3553(a), (a)(2) ..............................................................................................27

**Rules**
U.S.S.G. § 1B1.1(E) ........................................................................................................20
U.S.S.G. § 3E1.1(a) ........................................................................................................23
U.S.S.G. § 2A2.2(b)(2)(B), (2) ........................................................................................2
U.S.S.G. § 2A2.2(b)(3)(A), and (3) .................................................................................2
U.S.S.G. § 2H1.1(b)(1) ..............................................................................................21, 22
U.S.S.G. § 3E1.1 ......................................................................................................22, 24
U.S.S.G. § 3E1.1(b) ............................................................................................22, 23, 24

**Other Authorities**
*You're Not Alone: Reconceptualizing Solitary Confinement from the Default Punishment to A Last Resort by Focusing on Mental Health*,
2025 U. Ill. L. Rev. 681 (2025) ......................................................................................33

I.     **INTRODUCTION**

The Defendant, Morteza Amiri, by and through his counsel, respectfully submits this Sentencing Memorandum in advance of the consolidated sentencing hearing scheduled for June 24, at 1:00 pm, in two cases: Nos. 23-CR-00269-JSW (the "269 Case") and 23-CR-00264-JSW (the "264 Case").[1]  Counsel for Mr. Amiri urges this Court to impose a sentence that reflects not only the nature and circumstances of the offense, but also Mr. Amiri's personal history, acceptance of responsibility, other mitigating factors, and significant potential for rehabilitation.

While the Sentencing Guidelines are the starting point in the sentencing process, they are neither binding nor presumed reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009).  The Guidelines are only one factor for the Court to consider, to be given no more weight than any other. *Gall v. United States*, 552 U.S. 38, 59 (2007); *United States v. Carty*, 520 F.3d 984, 991 (2008). District courts have discretion to impose sentences well below the Guidelines range.  *See, e.g.*, *United States v. Boyer*, 275 Fed. App'x 655, 656 (9th Cir. 2008) (affirming sentence of 12 months and 1 day "well below the Guidelines range of 45-57 months"); *United States v. Beltran-Moreno*, 556 F.3d 913, 915–16 (9th Cir. 2009).  And they "may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 522 U.S. 85, 101 (2007)(internal quotation marks omitted; alterations in original).

"[T]he punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487–488 (2011) (internal quotation marks omitted).  While the Court starts with the Guidelines, it must "make an individualized assessment" of a just and proper sentence under the factors presented in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 50; *Kimbrough*, 522 U.S. at 91; *see United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.").  Pursuant to section 3553(a)**,** the Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public, and provides the defendant with

---

[1] Unless otherwise stated, all citations to the docket herein are to the docket in the 264 Case.

1    needed training or care.

2        Furthermore, courts have acknowledged the importance of considering a defendant's

3    potential for rehabilitation and the personal challenges that may have contributed to the offense. In

4    *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008), the Ninth Circuit held that courts must consider

5    not only the seriousness of the offense but also the defendant's background, character, remorse,

6    mental health treatment, and "familial support." *Id.* at 1001–02, 1003. Similar to circumstances

7    within our case, in *United States v. Pauley*, 511 F.3d 468, 470, 474–75 (4th Cir. 2007), the Court

8    found that the defendant's remorse, good character, and loss of his teaching certificate and state

9    pension were mitigating factors that justified a lower sentence.

10       U.S. Probation's Presentence Report and Sentencing Recommendation ("PSR") calculates

11   an offense level of 29, which corresponds to a custodial sentencing range of 87 to 108 months.  As

12   a preliminary matter, this calculation is incorrect for four reasons.  It improperly adds (1) a four-

13   level enhancement for use of a dangerous weapon under § 2A2.2(b)(2)(B), (2) a three-level

14   enhancement for bodily injury under § 2A2.2(b)(3)(A), and (3) a six-level enhancement for

15   committing the offender under color of law under § 2H1.1(b)(1)(B); and, it (4) improperly declines

16   to deduct points for acceptance of responsibility under § 3E1.1.  When these errors are corrected,

17   the total offense level is 13, which corresponds to a Guidelines range of 12–18 months.

18       Assuming *arguendo* that U.S. Probation's Guidelines calculation is correct, a sentence

19   within the range of 87 to 108 months would fail to give sufficient weight to the factors enumerated

20   in 18 U.S.C. § 3553(a).  Indeed, U.S. Probation has recommended a sentence of 60 months, which

21   is substantially below the low-end of the range that it calculated.  This recommendation is based on

22   multiple mitigating factors, including "the significant number of traumatic events [Mr. Amiri] was

23   exposed to over the course of his career as a police officer, his diagnosis of post-traumatic stress

24   disorder, … the difficult and dangerous" working environment for police officers in the City of

25   Antioch, the "significant insight" Mr. Amiri has demonstrated "in discussing his mental health, his

26   history of difficult experiences as a police officer, and his desire to effect a better future for himself

27   and his family," and "his responsibilities to his young children and a wife dealing with ongoing

28

1    medical issues." PSR at 39.[2]  The factors noted by Probation—and additional factors, including

2    that Mr. Amiri is a first-time offender, who has accepted responsibility, shown genuine remorse,

3    lost his California POST peace officer certification, and made significant efforts toward

4    rehabilitation in the nearly two years since he was indicted—counsel for an even lower sentence

5    than what Probation has recommended.  Even if the Court accepts the Guidelines calculation set

6    forth in the PSR, Mr. Amiri's sentence should be no greater than 48 months.

7    **II.      FACTUAL BACKGROUND**

8          **A.      Mr. Amiri's Upbringing Instilled in Him a Lifelong Identity of Selflessness and**

9                   **Service, Including a Dream to Serve His Community as a Police Officer**

10         Mr. Amiri's life story is one marked by hardship, resilience, and determination to rise above

11   the pain of his early circumstances.  Born in Palo Alto, California, he spent the first few years of his

12   life in Iran with his mother and father.  *See* PSR ¶ 76–77.  At just three years old, Mr. Amiri's

13   world changed dramatically when his mother, during what was intended to be a short visit to

14   California, discovered that Mr. Amiri's father, with whom she had entered an arranged marriage

15   when she was 16, had a second, secret family.  *See id.* ¶ 77; *see also* Ltr. No. 1 (Mother) at 1.  That

16   betrayal forced a permanent separation and left Mr. Amiri without a father figure during his most

17   formative years.  His father remained in Iran, made no effort to be part of his life, and offered no

18   financial or emotional support.  *See* PSR ¶ 76–77.  Nevertheless, Mr. Amiri's mother resolved to

19   "never speak ill of his father" believing it important to teach him "not bitterness, but goodness."

20   *See* Ltr. No. 1 (Mother) at 1.  The absence of his father was a quiet but powerful force in his life.

21   *See id.* at 3 ("At every milestone, whether kindergarten, elementary, middle, or high school,

22   Morteza would hug me and say, 'I wish my dad was here too.'").  As an adult, when his father

23   reached out after the tragic death of Mr. Amiri's half-brother, Mr. Amiri chose forgiveness over

24   resentment.  *See* PSR ¶ 77.  Notwithstanding decades of abandonment, he began communicating

25   with his half-siblings in Iran and now regularly sends charitable donations to help them provide

26

27   _____

[2] The PSR was docketed at Docket Number 431 in the 264 Case and Docket Number 468 in the 269

28   Case.

DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM

food and livestock to families in need.  *See id.*

In his father's absence, Mr. Amiri was raised by a devoted and hard-working single mother, alongside his maternal grandparents.  *See id.* ¶ 78.  He grew up in a loving, culturally rich, multigenerational household that valued honesty, hard work, and generosity.  Mr. Amiri's grandfather, in particular, stepped into the paternal role, offering Mr. Amiri guidance, patience, and unconditional love.  Mr. Amiri spent weekends with him selling fruit at farmers markets and roadside stands throughout the Bay Area, forging a work ethic and a deep sense of family responsibility that has stayed with him.  *See* PSR ¶ 80.

For a time, Mr. Amiri also lived with one of his mother's eight siblings, a sister with three sons of her own.  *See* Ltr. No. 1 (Mother) at 2 ("Morteza and I also lived with my sister, who was raising three sons of her own.  I intentionally chose this environment so that he could experience and develop a sense of brotherhood within a nurturing family setting.").  Mr. Amiri's cousins recount how he "quietly raised the bar" for their behavior as children and adolescents because their parents would often point to him as an example of how to be "more respectful, more thoughtful, [and] more diligent."  Ltr. No. 2 (Cousin) at 1 ("Morteza helped shape me into a better version of myself.  I became a more attentive son and a more responsible older brother.").[3]

Mr. Amiri also sought to assist his mother financially by working multiple jobs as a teen.  Ltr. No. 1 (Mother) at 4 ("At the age of fourteen, he started working for Prudential Realty as a flyer distributor, a role he maintained as a side job for several years while working other jobs and finishing high school . . . .  He never wanted to be a burden to anyone, so he took on multiple jobs to support himself and help others.").  Mr. Amiri's generosity extended beyond his family to members to his community and beyond, particularly to those in need.  His mother recalls how her

---

[3] *See also* Ltr. No. 3 (Cousin) at 1 ("My father naturally became a father figure to him as we lived together, but in many ways Morteza became a role model to me."); Ltr. No. 4 (Cousin) at 1 ("We lived in our grandparents' home, and while other kids played without a care in the world, Morteza was stepping into the role of protector before he even became a teenager.  At just 11 years old, he was responsible for watching over my younger brother and me.  He took it seriously."); Ltr. No. 5 (Cousin) at 1 ("He even managed to solidify himself as the kid that every parent on the block wanted their kids to play with because of his ability to recognize danger and respond so effortlessly.").

1  son "broke open his piggy bank and said he wanted to send the money to poor children who didn't

2  have a father." *Id.* at 3.  His cousin remembers, "I once told him he should take some time to give

3  back to the community, and so the following week, he stood in front of the local grocery store and

4  gave out handwritten cards that read, 'You're special, have a great day!'" Ltr. No. 6 (Cousin) at 1.

5  As a child grappling with the emotional toll of his father's abandonment, Mr. Amiri

6  developed an early respect and admiration for police officers.  His mother recalls, "Whenever he

7  encountered a police officer in public, he would respectfully approach them to salute and shake

8  their hand." Ltr. No. 1 (Mother) at 3.  This admiration evolved into a dream of becoming a police

9  officer himself.  Mr. Amiri took steps to pursue that goal early in life.  He sought out local police

10  officers as mentors, accompanying them on dozens of ride-alongs.  He remains close friends with

11  one of those officers, who recalls Mr. Amiri being a "very bright" but also "impressionable young

12  man"—the "type of kid who wanted to fit in just to feel a part of something." *See* Ltr. No. 7 (Police

13  Officer Mentor; Friend) at 1.  Mr. Amiri also participated in youth academies with the Pleasanton

14  and Dublin Police Departments during middle and high school.  These programs exposed him to

15  law enforcement operations, such as emergency vehicle driving courses, jail visits, and even patrol

16  boat rides.  He volunteered with the Dublin Police Department as a high school student.  *See* PSR

17  ¶ 82.  On the weekends, "he worked at police booths at community events …, handing out resource

18  materials to educate community members about the department's services." *Id.*  These experiences

19  deepened his commitment to building a career in public service.

20  Mr. Amiri's mother remembers the personal sacrifices that Mr. Amiri made in pursuit of his

21  dream, such as waiting overnight in line to enroll in a police academy and "declin[ing] the financial

22  support [she] had put aside for him," opting to pay his own tuition.  Ltr. No. 1 (Mother) at 4.  She

23  states that, as a police officer, he was dedicated and courageous, taking on dangerous assignments

24  and continuing to support his family and community in quiet, meaningful ways, such as offering

25  housing to friends in need and delivering meals to the homeless with his wife and children.  His

26  mother emphasizes that Mr. Amiri has never been materialistic or prideful and has always acted out

27  of a sense of duty and compassion.  She notes that, even while incarcerated pending sentencing, Mr.

28  Amiri remains humble, prayerful, and forgiving, expressing deep remorse and continuing to think

1   of others before himself.  *See id.* at 7.

2          The dozens of letters of support accompanying this sentencing memorandum—written by

3   Mr. Amiri's family, friends, and colleagues—share a consistent and powerful theme: his

4   commitment to serving and caring for others.  Time and again, these letters recount acts of

5   compassion, humility, and selflessness.  The following passages are representative examples, from

6   his childhood to the present:

> My husband, Morteza's grandfather, was a man deeply committed to serving others . . . Whenever he found someone who could use a helping hand, he would ask me to prepare food, and together we would bring Morteza, only three years old at the time, along with us. This was our way of instilling in him the values of humanity, sincerity, generosity, respect, love, and most importantly, humility and selflessness. Morteza absorbed these lessons wholeheartedly. As he grew older, he not only embraced these acts of service but joined us with genuine passion. Whether it was visiting senior homes, delivering food to families in need, or distributing clothing to the less fortunate, Morteza never hesitated. These experiences didn't just shape his character, they inspired his desire to serve others through law enforcement, with the ultimate goal of keeping people safe. Morteza carried these values into adulthood. When he chose to become a police officer, I tried to dissuade him, fearing for his safety. But he explained to me that his mission was to protect the innocent, especially children.

15  Ltr. No. 8  (Grandmother) at 1.

> There's a moment from our childhood that has always stayed with me. The room Morteza shared with my brothers had a very high ceiling and a narrow entryway where the walls on either side created a tight gap. We used to challenge ourselves by climbing up those walls using our arms and legs to press outward and shimmy up to the ceiling. We did this often and safely for quite some time. But one day, I pushed a little too hard. I was bigger and heavier, and I heard a loud crack as my foot went through the sheetrock. I panicked. Trying to cover it up, I moved one of Morteza's framed elementary school awards and placed it awkwardly over the hole in the wall.
>
> It didn't take long for my dad to notice. The frame placement was too odd to ignore.  When he removed it and saw the damage, he called us in and said, "I know you've all been climbing this wall, and now it's damaged." Before he even asked who did it, Morteza immediately stepped forward and apologized. He didn't hesitate. It threw me off completely. He was taking the blame for something he didn't do. My older brother instincts kicked in, and I owned up to it right away. But that moment changed how I saw him. He was willing to sacrifice himself, to take the heat, to protect me. Not because anyone asked him to, but because it was just in his nature.

26  Ltr. No. 2 (Cousin) at 1–2.

> During our teenage years, our grandfather who ran a fruit business, would wake us up at the crack of dawn to go lift heavy fruit boxes whether it was in the scorching Central Valley heat during summer break or in the cold

1    winter mornings. This went on for years and Morteza never complained,
2    even when I made excuses not to go, he would still show up for him. It was
     a choice, a choice he made because his values of helping others is higher
3    than spending his weekends off school as an early teen. He was not paid at
     all, it was out of pure commitment and desire to help, he always told me
4    "Gotta help grandpa he needs it".  Week after week, out of love and duty to
     our grandfather.

5    Ltr. No. 3 (Cousin) at 1.

6    Morteza . . . [did] 4 a.m. wake up calls during his summer break to help
     our 70-year-old grandfather pick up hundreds of boxes of fruits from the
7    farmers in Fresno. He did that often, and I never once heard him complain;
     he did it with compassion and care. In all of this, he kept his love and
8    honor for the police force near and dear to his heart, sharing stories of him
     going on ride-alongs with officers instead of spending time with friends.
9    He often spoke of the importance of keeping a community safe and
     protected.

10

11   Ltr. No. 6 (Cousin) at 1.

12   I first met Morteza while working together at Target in 2011.
     . . .
13   Morteza and I became close friends during our time at Target and during
     both of our transitions into becoming police officers in the Bay Area.
14   . . .

15   From my experience, Morteza has consistently demonstrated integrity,
     kindness and selflessness.  This is evident by a time before he was a police
16   officer, I remember he witnessed a horrific collision on the freeway in front
     of him, and stopped to provide care—notably, prior to being compelled by
17   peace officer oath . . .  [E]ven with Morteza having a sprained ankle and
     everyone else continuing to drive past the scene, he ran to her to try to render
18   aid.

19   Ltr. No. 9 (Friend) at 1–2.

20   During the demanding field training process, Morteza was one of the only
     officers who extended kindness and went the extra mile to ensure my
21   success, even though that wasn't a part of his formal role. He took the time
     to print reference guides, organize a binder with essential paperwork, and
22   offer words of encouragement that had a lasting impact on me. I was so
     moved by Morteza's generosity and support that I later wrote an email to
23   the Sergeant in charge of the field training program to make sure Morteza
     was properly recognized for his efforts.
24   . . .
     I believe a quote that Morteza had in the biography line of his social media
25   page for years succinctly defines who he is. It read, "Don't look down on
     someone unless you are giving them a hand up." I have seen Morteza live
26   this quote countless times. Almost a decade ago, Morteza did this for me as
     a new officer trying to find my way, and now I am returning the favor.

27

28   Ltr. No. 10  (Brentwood Police Department Officer) at 1.

[D]uring his time as a police officer[, my husband] met a homeless individual who was struggling with drug addiction, and instead of simply seeing him as another statistic, Morteza saw a human being in need of compassion. He took the time to talk with him, understand his story, and offer genuine encouragement to turn his life around. Morteza made a promise to this man: if he got clean and sober, he would help him in any way he could.

Years later, long after their initial encounter and after Morteza was no longer in law enforcement, the man ran into him again this time, proud and sober. He told Morteza he had stayed clean and was trying to rebuild his life. True to his word, Morteza asked what he could do to help. The man shared that he needed a vehicle to get to work and move forward in life. He already had a car in mind and had saved some cash, but he didn't know how to navigate the buying process. Morteza guided him every step of the way helping him understand how to purchase a car and then generously paid for the majority of it out of his own pocket. This wasn't done for recognition or praise, but because that's who Morteza is.
. . .
When Morteza was a police officer, he would often pay for the people behind him in line when going through a food drive-through or getting coffee. Sometimes, these individuals would notify the police department of his kindness. However, Morteza never did this for recognition he genuinely enjoyed giving back. His mother raised him to always put people first, and that is exactly how we are raising our children.

Ltr. No. 11 (Wife) at 4.

Morteza has been a part of our family since 2017. He is an incredible husband to my only daughter and a devoted father to my two grandchildren.
. . .
There's a memory I carry with me that I will never forget. I was involved in a serious car accident, rear-ended on the freeway while driving home from work. I was completely hysterical and panicked, and I called my daughter. Morteza was on duty at work, but the moment he heard what had happened, he rushed to the scene. He found me in complete shock, shaking and overwhelmed, and he immediately calmed me down and reassured me I was okay. He even made sure the other driver involved was alright and stayed by my side until the California Highway Patrol arrived. That moment showed me what kind of man Morteza truly is calm, compassionate, and deeply selfless.
. . .
Morteza is also the kind of person who is always there for anyone who needs help. One example that speaks to his incredible character involves my nephew, who was struggling with addiction and headed down a destructive path. Morteza would sometimes come into contact with him while on duty, and instead of treating him like a lost cause, he tried to help. He looked for recovery programs, brought him food, and always treated him with kindness and dignity.

Ltr. No. 12 (Mother-in-Law) at 1–2.

Morteza has been a wonderful husband to [my daughter] and a loving,

present father to my great-grandchildren. His devotion to his family is clear in everything he does. I also want to share that I was granted legal custody of my great-grandson . . . when he was just one year old. [He] is now ten. Sadly, his biological parents chose a troubled path and are not involved in his life. Throughout all of this, Morteza has always treated [my great-grandson] as his own, including him in activities with his own children and making sure [he] felt loved and supported.

As an elderly woman in my eighties, I have often needed help around my home or with my car, and Morteza has always been there without hesitation. Whether it was moving furniture or helping with mechanical issues, he has consistently shown generosity, patience, and care.

Ltr. No. 13 (Grandmother-in-Law).

I have known Morteza for 9 years.  I first met Morteza when he lived across the street from me.  I knew Morteza was a police officer in Brentwood, and he knew I was a police officer for the city of Antioch.
. . .
As a solo police officer with Antioch, Morteza was viewed as a person of integrity, kindness, and responsibility.  Morteza had consistently shown a commitment to the community and was actively involved in various volunteer activities at the police department, i.e., H[a]llowe[e]n events, adopt a family event, and any other event sponsored by the police department that was for the community.

Ltr. No. 14 (Retired Antioch Police Department Officer; Former President of Antioch Police Officers' Association) at  1–2.

Morteza has one of the biggest hearts I've met . . . He would take care of the needs of his neighbors, identifying a chore or act of service he would be able to help out with, making sure he took the time to do what he promised. He would stop by my office to ask if I was okay if he knew I had a difficult encounter at work or was just having a tough time with work in general. He checked-in to see if I needed anything, and he would show up when asked to because he was a supportive friend. This type of caring from a sworn individual was not always the expectation or experience that many civilian employees, outside of dispatch, would have with their officers. But Morteza was different, he saw the person and not the title or the place within the organizational structure. He wasn't "better than" and let you know he enjoyed you as a person.

Ltr. No. 15 (Antioch & Brentwood Police Department Records Employee; Friend) at 2.

I am writing on behalf of Morteza Amiri, whom I have known since he was hired by the Antioch Police Department in 2017. I worked with Morteza until he was fired.
. . .
I have found Morteza to be compassionate and caring based on my personal interactions with him and observing him on various calls for  service [with Antioch Police Department]. Morteza routinely took the time to listen to

9

DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM

1    and understand the victims of crimes and provide them with a level of
2    service that went beyond basic law enforcement.

3  Ltr. No. 16 (Retired Antioch Police Department Officer; Friend) at 1.

4    We have known Mr. Amiri for close to six years, since we moved into the
     neighborhood, we live three houses away.
5    …
     Mr. Amiri has always been . . . caring and respectful to us, he has helped
6    through two knee replacement surgeries over the past three years, helping
     us with yardwork, putting out our garbage cans, bringing in groceries with
7    my wife and always checking to see if we were in need of his assistance.

8    One thing that was special to us was that his family shared their
     Thanksgiving Dinner with us right after my recent knee replacement
9    surgery.

10  Ltr. No. 17 (Neighbors).

11    I first met Morteza Amiri when he was referred to me by a client to assist
     with selling a property. What began as a professional connection quickly
12   evolved into a valued working relationship and a genuine friendship.
     . . .
13   One encounter that truly stood out to me involved a man named Jordan,
     someone Morteza had previously arrested on multiple occasions. At the
14   time, we were preparing a house for sale, and Jordan had somehow been
     staying there with the owner's permission. Jordan was clearly unstable—
15   you could tell he was on drugs and emotionally unpredictable. To be honest,
     I was terrified of him and avoided any interaction. But every time we saw
16   him, Jordan would approach Morteza like they were old friends. He would
     smile, initiate conversation, and more than once, he praised Morteza for
17   always being fair and kind. He shared that while most officers had treated
     him with rudeness or aggression, "Teza" had always shown him respect and
18   compassion. What struck me was how Morteza, in return, treated Jordan
     with the same grace and dignity, never once dismissing him or making him
19   feel less than.

20  Ltr. No. 18 (Real Estate Colleague; Friend) at 1–2.

21    I am writing this letter in support of my colleague and friend, Morteza. I
     have had the opportunity to work side by side with him for the past two
22   years, and during that time, I have come to know Teza—as we call him—
     as a person of unwavering integrity, deep compassion, and remarkable
23   humility.
     . . .
24   He's the first one to not only show up for work but to show up for me
     personally. He checks in with me every day—genuinely asking how I'm
25   doing, how my kids are, and if there's anything I need. He doesn't do this
     out of obligation or to be polite; it's simply the kind of person he is.
26

27  Ltr. No. 19 (Real Estate Colleague; Friend) at 1.

28    I have known Morteza Amiri since he was teenager, so about 18-19 years

10
DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM

now . . . I became a big brother to him, more like a role model and mentor.
…
[W]hile no longer working in law enforcement Morteza started a business on his own after quickly learning how to purchase homes and renovating them. Part of his business was to provide livable homes in the area as most w[]ere pretty much trashed and unlivable; he wanted to help get rid of the blight in the area. Even with the responsibility and stress of what is to come he continued to be available for his family and others.

Ltr. No. 7 (Police Officer Mentor; Friend).

I am Morteza's younger cousin and have always considered him my big brother.
. . .
In December 2023, I endured the first act of abuse in my marriage. I was terrified-not just for myself, but for my two young sons, [] who [were] six … and [] two. I was ashamed and stayed silent for too long. But when I finally found the strength to speak up, Morteza didn't flinch. He didn't just offer comfort-he gave me and my boys his own home, opening his doors to us without hesitation, even though he had his own young children to care for.

I felt embarrassed accepting so much, so Morteza gently handed me money so I could go to a hotel if I wanted privacy. What I didn't know then was that he had also quietly set aside money for my legal fees-money he knew I would need for protection during my divorce, especially because he anticipated he might not be able to be there for me physically if he served time. Even in his own darkest hour, he thought about how to protect me.

Ltr. No. 4 (Cousin) at 1–2.

Mr. Amiri's generosity and care for his community is further reflected in the life he built with his wife and their two young children. He is a loving, devoted father and partner who treasures family time and traditions that include giving back to the community. Before his incarceration, he and his wife regularly prepared and delivered meals to unhoused individuals across the Bay Area, bringing soup, sandwiches, and compassion to those often overlooked. *See* Ltr. No. 11 (Wife) at 4–5.

Mr. Amiri's relationship with his wife is marked by deep love, steadfast support, and shared resilience through hardship. From the moment they met, his wife describes falling in love with his warmth, humor, and kindness, qualities that have remained constant through years of marriage, parenthood, and public adversity. *See id.* at 1. Mr. Amiri's wife has been by his side not only during the heights of his law enforcement career, where he was admired for his dedication and leadership, but also through the painful unraveling of their private life during this investigation. *See*

---

11

DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM

1  PSR ¶ 85.  Mr. Amiri has likewise supported his wife through recent health challenges.  Her father

2  explains:

> After the birth of my granddaughter, my daughter became very ill. It took
> a long time to get a diagnosis, and during that time she was constantly in
> and out of the emergency room. It was one of the most difficult and
> heartbreaking periods we've ever gone through as a family. But Morteza
> never left her side.  He took care of her and both children, juggling
> everything on his own while never showing frustration or fear. He was
> calm, patient, and steady. He carried the weight for all of us, and I'll never
> forget the strength he showed during those months.

8  Ltr. No. 20 (Father-in-Law) at 1.  Mr. Amiri's in-laws "take great comfort knowing [their] daughter

9  chose someone so deeply good-hearted to share her life with."  Ltr. No. 12 (Mother-in-Law) at 1.

10  "As the father of an only daughter," Mr. Amiri's father-in-law has "always been very protective of"

11  his daughter" and has "always known that whoever took her hand would also have to earn [his]

12  trust and respect."  Ltr. No. 20 (Father-in-Law) at 1.  "Morteza did both and continues to, every

13  day."  *Id.*

14       Mrs. Amiri's letter reflects the anguish of witnessing the man she loves endure professional

15  loss, public humiliation, and emotional pain, yet she also underscores his strength and his refusal to

16  give up, his turn toward therapy, and his steadfast presence as a father and partner.  *See* Ltr. No. 11

17  (Wife) at 2, 5–6.  She asks not for leniency without accountability, but for a path that allows their

18  family to remain whole, so that Mr. Amiri can continue being the devoted husband and father he

19  has always promised to be.  *See id.* at 6.  Her voice, grounded in both love and heartbreak, offers

20  powerful testimony to Mr. Amiri's character and the importance of preserving the family unit

21  they've fought so hard to protect.

22       **B.**     **Mr. Amiri's Challenging Experiences as a Law Enforcement Officer in a High-**

23               **Crime Jurisdiction Resulted in PTSD and Struggles with Alcohol**

24       Almost every officer or supervisory officer who testified during the trial in the 269 Case

25  recounted the extreme conditions they encountered while employed as a peace officer with the

26  Antioch Police Department.  Officer Rombough specifically described Antioch as the most

27  dangerous place he had ever worked, referring to it simply as "chaos."   Dkt. 362  at 960, 964 (269

28  Case Trial Transcript).  The former President of the Antioch Police Officers' Association writes in

his letter of support for Mr. Amiri that, in his "28-year tenure with Antioch," the jurisdiction was "twice listed in the top 10 most dangerous cities in California." Ltr. No. 14 (Retired Antioch Police Department Officer; Former President of Antioch Police Officers' Association) at 1.

Others testified similarly, describing the city as a high-crime environment requiring constant vigilance, with limited staffing, extended shifts, and frequent exposure to death and violence. The onset of the COVID-19 pandemic exacerbated these conditions, undermining accountability systems and intensifying community tensions. *See* Dkt. 362 at 807 (269 Case Trial Transcript). Criminals who typically would have been booked into the jails for serious felonies were released and left to continue committing violent offenses that put Antioch police officers in even greater dangers of their safety. Officer Rombough shared that he made peace with the daily possibility of not returning home, acknowledging the psychological toll that reality exacted. *Id.* at 979. Not only were the dangers from the criminal community heightening, but the Antioch Police Department was also failing to take into consideration the psychological toll on its officers. Due to the absence of mental health options for Antioch Police Department officers, the officers, including supervising officers, opted to engage in group text messages as a way to debrief from the day's work and commiserate with one another to cope with the stress of the job.

In late 2019 to early 2020, after serving approximately five years as a police officer and responding to numerous critical incidents, Mr. Amiri began experiencing significant psychological distress. *See* PSR ¶ 91. His symptoms included hopelessness, anxiety, chronic insomnia, nightmares, intrusive memories, and sudden mood swings. *See id.* Recognizing that he was not feeling like himself and wanting to be "the best dad possible" to his son born in December 2020, Mr. Amiri proactively sought mental health support from a licensed marriage and family therapist (MFT) who specialized in providing services to law enforcement personnel. *Id.* He remained in treatment for more than three years. *See id.*

In August of 2023, Mr. Amiri was formally diagnosed with post-traumatic stress disorder (PTSD) by two qualified professionals, including Dr. David L. Green, Ph.D., with Collaborative Transformation Psychology Inc. Dr. Green's evaluation of Mr. Amiri noted that Mr. Amiri has been exposed to "distressing scenes, gruesome homicides, and profound loss" throughout his

1    career.  *See* PSR ¶ 91; *see also id.* ¶¶ 92–98.

2        Mr. Amiri has also been candid about his struggles with substance use, which developed

3    concurrently with his mental health decline.  *See* PSR ¶ 101.  Due to his Muslim faith and cultural

4    background, alcohol use had long been discouraged in his family.  *See id.* As such, he did not begin

5    drinking alcohol until approximately 2011, after he turned 21.  *See id.*  His drinking increased

6    markedly in 2019, after a couple years with the Antioch Police Department.  *See id.*  Initially, he

7    consumed two to three beers or hard seltzers per day, escalating to four to five drinks on his days

8    off.  *See id.*  In 2020, there was a period when his alcohol consumption increased to approximately

9    half a bottle of vodka on four occasions per month.  *See id.*  Mr. Amiri's initial alcohol

10   consumption began in a social context after joining the police force.  *See id.*  Over time, however,

11   this evolved into solitary drinking as a way to cope with traumatic experiences and painful

12   memories from his work.  *See id.*

13       Mr. Amiri is uncertain about whether alcohol use directly contributed to his involvement in

14   the offenses.  *See id.*  He did not consume to the point of blacking out, nor does he believe he drank

15   enough to severely impair his judgment. and he never drank while on duty.  *See id.* Nevertheless,

16   alcohol became a significant component of his social life as a police officer, particularly within the

17   context of friendships with his co-defendants and fellow officers.  *See id.*

18       **C.    The Offense Conduct**

19       The below detail regarding the offense conduct in each case is provided not to excuse Mr.

20   Amiri's conduct, but to explain the nature and circumstances of the offense in connection with 18

21   U.S.C. § 3553(a)(1).  Mr. Amiri knows that what he did was wrong and takes full responsibility for

22   what he did, as described below.  *See* PSR at 14–16; *see also infra* § III.B.3.b.

23           **1.    269 Case (Use of Force)**

24       Mr. Amiri acknowledges the seriousness of the offense and offers no excuse for his actions.

25   While Mr. Amiri cannot precisely recall his state of mind during the moment the incident with A.A.

26   occurred, he recognizes that who he was then does not reflect the person he is today. *See* PSR at 15.

27   On July 24, 2019, while patrolling a high-crime area, Mr. Amiri contacted a bicyclist, identified as

28   A.A. When A.A. disregarded verbal commands and attempted to flee into an apartment complex,

1   Mr. Amiri pursued him on foot, took him to the ground, and believing A.A. was resisting, called for

2   his K-9 to assist in the apprehension. At the time, Mr. Amiri was accompanied by a ride-along who

3   was a sworn officer from a neighboring agency, and that officer assisted in the deployment of the

4   K-9. In his police report, Mr. Amiri failed to disclose the presence and involvement of the ride-

5   along officer, mistakenly believing at the time that such detail was not necessary to include. At least

6   one additional officer also responded to assist. The report was submitted and reviewed through the

7   chain of command without correction. *See* PSR ¶ 43.  Mr. Amiri deeply regrets this lapse in

8   judgment and has since come to understand the significance of that omission.

9        At the time, Mr. Amiri was working in a high-crime area where daily exposure to violence,

10  trauma, and constant threats to public safety created a relentless atmosphere of stress and urgency.

11  He operated in an environment that demanded split-second decisions under immense pressure, often

12  fueled by adrenaline and an overwhelming sense of duty. *See* PSR at 16.  Over time, the emotional

13  toll of the job, compounded by repeated exposure to horrific scenes, including over 50 calls

14  involving deceased individuals began to erode his mental health and cloud his judgment. *See* PSR

15  ¶ 92.  Despite efforts to maintain his well-being, Mr. Amiri found himself deeply consumed by the

16  identity and demands of the job. The culture of praise for rapid, aggressive enforcement contributed

17  to a gradual blurring of the line between effective policing and harmful conduct. With the benefit of

18  distance and reflection, Mr. Amiri now clearly sees how the cumulative impact of trauma, stress,

19  and the culture at the Antioch Police Department influenced his actions and contributed to this

20  offense.  *See* PSR at 15-16.

21              **2.    264 Case (Wire Fraud)**

22        Growing up in a single-parent household, Mr. Amiri watched his mother, an immigrant to

23  the United States, "juggle[] a full-time job with business classes in order to obtain [her] college

24  degree." *Id.* ¶ 77; *see also* Ltr. No. 1 (Mother) at 2 ("While working full time simultaneously

25  holding two positions, at Domino's Pizza and as an office manager at Palace Auto Center, I

26  remained committed to advancing my education.  I began by earning an Associate of Arts degree in

27  Business Administration, followed by continued studies toward a Bachelor's degree in International

28  Business Management.").  Mr. Amiri knew that his mother deeply valued education and wanted

1    him to pursue a career in business as she had.  When he began demonstrating a sincere interest in

2    pursuing a law enforcement career at a young age—including by crafting an FBI identification card

3    for himself with crayons (*see* Attachment to Ltr. No. 1), seeking out mentors in local police

4    departments, saluting police officers he encountered in the community, and collecting cards from

5    officers in an album he kept under his bed—his mother "often" tried to steer him "toward a safer

6    path." *Id.* at 3–4.  Although he ultimately enrolled in police academy as soon as he could after

7    attaining his Associate's degree, going so far as to sleep outside the academy overnight to secure

8    one of two remaining spots (*id.* at 4), the concerns his mother had expressed about his safety and

9    her hope that he would finish his college education remained on his mind.  Thus, in 2015, Mr.

10   Amiri "enrolled in California Coast University [("CCU")] with the intention of chipping away at a

11   Bachelor's degree part-time."  PSR at 16.

12        But Mr. Amiri's educational progress was slow.  When he enrolled in CCU in 2015, he was

13   a relatively new, but ambitious, officer with the Brentwood Police Department, having started there

14   in December 2014, and his sights were set on securing a position with the higher-crime jurisdiction

15   of Antioch.  *See* Ltr. No. 14 (Retired Antioch Police Department Officer; Former President of

16   Antioch Police Officers' Association) at 1.  He found time to complete one course toward his

17   Criminal Justice degree in the fall of 2017.  *See* PSR at 16.  Shortly thereafter, in November 2017,

18   he joined the Antioch Police Department and "became consumed with police work." *Id.*

19        Although Mr. Amiri paid CCU $5,265 in tuition between 2015 and 2018 (*see* PSR ¶ 22), he

20   did not complete any other courses besides the one in 2017.  In March 2019, Savannah Reed—a

21   trial witness who testified that she viewed Mr. Amiri, her former close friend, as a brother at the

22   time—proposed a way to fast-track Mr. Amiri to a Bachelor's degree, offering to take his CCU

23   coursework for him, in exchange for payment.  *See* PSR ¶ 19.  Mr. Amiri learned that Ms. Reed was

24   doing the same for her then-boyfriend, Patrick Berhan, a former Pittsburg Police Department officer

25   and another then-close friend of Mr. Amiri's.  *Id.*  Mr. Amiri understood that Mr. Berhan would use

26   the Bachelor's degree that Ms. Reed completed for him to obtain a pay raise from the City of

27   Pittsburg under an educational incentive program similar to the one available to City of Antioch

28   police officers.  *Id.*  Ms. Reed twice offered the same services to Mr. Amiri in March 2019, but he

1   did not respond.  *See id.* at 16.  He remained hopeful that he could finish the degree himself.  *Id.*

2          Unfortunately, by late 2019, police work had begun to put a significant strain on Mr.

3   Amiri's mental health.  *See id.* at 16.  He "started to experience feelings of hopelessness and

4   flashbacks to difficult scenes [he] had been called to involving innocent victims," as well as

5   "anxiety, sleeplessness, [and] nightmares."  *Id.*; *see also id.* ¶¶ 91–98.  He also began hearing about

6   police officers whose struggles with PTSD or physical injuries had sent them into early retirement.

7   *See id.* at 16.  Increasingly worried about what he would do if his career—the only career he had

8   ever imagined himself in since childhood—were to be cut short for similar reasons, Mr. Amiri

9   reached back out to Ms. Reed in December 2019 and hired her to complete his Bachelor's degree

10  coursework.  *See id.* ¶¶ 19–20.

11         On April 17, 2020, CCU awarded Mr. Amiri a Bachelor's degree on the basis of courses

12  that Ms. Reed had taken on his behalf.  He then applied for and received a 2.5% increase in pay.  *Id.*

13  ¶ 21.  In total, Mr. Amiri received $10,526 in incentive pay.  *Id.*  ¶¶  21–22 & n.2.  Mr. Amiri paid

14  Ms. Reed over $3,000 to complete his coursework.  *See id.* at 15; *see also id.* ¶ 20.  He paid CCU

15  over $5,000 in tuition payments.  *See id.* ¶ 22.  Although the City of Antioch allowed police officers

16  to recoup up to $800 per year in tuition payments, Mr. Amiri did not apply to recoup any of his

17  tuition payments.  *Id.*; *see also* Dkt. 338 at 39:10-18 (Testimony of Antioch Police Department

18  Sergeant Trevor Schnitzius).  Altogether, Mr. Amiri netted less than $2,000 (pre-tax) from the

19  offense conduct after accounting for the tuition payments that he made to CCU and the payments

20  that he made to Ms. Reed to complete his CCU coursework.  PSR ¶ 22; *see also* Dkt. 415-26 at 60–

21  61 (Trial Ex. 055); Dkt. 415-40 at 4 (Trial Ex. 110).

22         By December 2023, just a few months after he was placed on administrative leave from the

23  police department and stopped receiving incentive pay, Mr. Amiri would have been eligible to

24  receive the same 2.5% pay increase regardless of the Bachelor's degree.  *Id.* ¶ 22 n.2.  Government

25  witness Trevor Schnitzius, a former Antioch Police Department captain, testified that Antioch's

26  educational incentive program offered an identical—and non-cumulative—2.5% pay bump for

27  anyone with an Associate's degree and nine years of law enforcement experience."  *Id.*; *see also*

28  Dkt. 338  at 31:11–32:7, 42:4–8, 49:12– 23 (Testimony of Antioch Police Department Sergeant

1   Trevor Schnitzius).  It is undisputed that Mr. Amiri would have satisfied those requirements by

2   December 2023.  *See* PSR ¶ 22 n.2.

3        Mr. Amiri knowledges that his conduct was "horrible" and "wrong," regardless of how

4   much he profited.  *Id.* at 14–16.   But, at the time, he "found ways to justify the behavior to

5   [him]self."  *Id.* at 16.  For example, as Savannah's close friend, Mr. Amiri knew that she could use

6   extra income because she was trying to get into nursing school.  *Id.*  And while she was working on

7   his Criminal Justice coursework, Mr. Amiri asked an Antioch Police Department Internal Affairs

8   sergeant what could happen if the police department found out that he had hired someone to

9   complete his courses. The sergeant said that Mr. Amiri could get disciplined or sued in a civil

10  lawsuit, at worst, but confided that his wife was also working on his degree.  *Id.*

11       As stated above, these details are provided to aid the Court's analysis of the section 3553

12  factors, not to justify Mr. Amiri's behavior.  Mr. Amiri understands that "similar conduct by others

13  doesn't make [his] conduct right and that [he is] responsible for the wrong choices that [he] made

14  with respect to [his] education and employment."  *Id.*

15  **III.    ARGUMENT**

16       **A.        Probation Miscalculated Mr. Amiri's Offense Level**

17        As reflected in the below table, the U.S. Probation Officer calculated Mr. Amiri's total

18  offense level at 29—for a Guidelines range of 87 to 108 months—and within criminal history

19  category I.[4]  *See* PSR ¶¶  53–60, 66, 111.  The U.S. Probation Officer also determined that because

20  the Guidelines range falls into Zone D of the Sentencing Table, the minimum term must be satisfied

21  by a sentence of imprisonment.  *See* PSR at 37.

| Count Group 2 | Points | Guidelines Provision(s) Cited |
|---|---|---|
| Base offense level | 14 | §§ 2H1.1(a)(1); 2A2.2(a) |
| Dangerous Weapon | +4 | § 2A2.2(b)(2)(B) |
| Bodily Injury | +3 | § 2A2.2(b)(3)(A) |
| Color of Law | +6 | § 2H1.1(b)(1)(B) |

---

[4] Mr. Amiri does not object to Probation's calculation of his Guidelines range for the 264 Case.  *See* PSR ¶¶ 46–51.

| | | |
|---|---|---|
| Obstruction of Justice | +2 | § 3C1.1 |
| Acceptance of Responsibility | 0 | § 3E1.1 |
| ***Total Offense level*** | **29** | |

Probation's offense-level calculation is incorrect for four reasons: it improperly includes (1) a four-level enhancement for use of a dangerous weapon under § 2A2.2(b)(2)(B), (2) a three-level enhancement for bodily injury under § 2A2.2(b)(3)(A), and (3) a six-level enhancement for committing the offender under color of law under § 2H1.1(b)(1); and, (4) it improperly denies a reduction for acceptance of responsibility under § 3E1.1.  When these errors are corrected, the total offense level is 13, which corresponds to a Guidelines range of 12–18 months.[5]

Even if the Court agrees with some or all of Probation's calculation, the Guidelines range of 87 to 108 months is greater than necessary to achieve just punishment and respect for the law given all the factors enumerated above.  Mr. Amiri's custodial sentence should not exceed 48 months.

### 1. Four-Level Enhancement Under U.S.S.G. § 2A2.2(b)(2)(B) (Dangerous Weapon) Should Not Apply

Mr. Amiri objects to the four-level enhancement under U.S.S.G. § 2A2.2(b)(2)(B) for use of a "dangerous weapon."  The enhancement is not supported by the trial record, and its application in this case would violate due process and principles articulated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Booker*, 543 U.S. 220 (2005).

First, the jury verdict form stated the elements of the offense in the disjunctive, allowing the jury to convict based on either the use of a dangerous weapon ***or*** the infliction of bodily injury.  *See* Dkt. 375  (269 Case Verdict Form).  The form did not require the jury to specify which of these alternative theories it unanimously found.  Therefore, it is not possible to conclude, without engaging in impermissible judicial fact-finding, that the jury found Mr. Amiri used a dangerous

---

[5] *See* U.S. Sentencing Comm'n, 2024 Guidelines Manual Annotated, Chapter 5 Part A, Sentencing Table, *available at* https://www.ussc.gov/guidelines/2024-guidelines-manual/annotated-2024-chapter-5.

1   weapon.  Applying this enhancement in light of the ambiguous verdict would improperly assume a

2   fact not found beyond a reasonable doubt by the jury.

3          Second, there is no evidence from which the Court may conclude that the K-9 deployed by

4   Mr. Amiri was a dangerous weapon because the Government failed to introduce any evidence or

5   expert testimony establishing that the K-9  is an "instrument capable of inflicting *death* or *serious*

6   bodily injury" and used with the intent to cause such harm.  U.S.S.G. § 1B1.1(E) (emphasis added).

7   While the jury may have found that the K-9 caused injury, no evidence demonstrated that it was

8   trained or used in a manner that satisfies the Guidelines definition of a dangerous weapon.  Without

9   a specific jury finding to that effect, and in the absence of evidentiary support, application of this

10  enhancement is inappropriate and should be rejected.

11         Third, Mr. Amiri has been unable to locate any federal cases concluding that a trained police

12  canine is a dangerous weapon within the meaning of the Guidelines definition.  The Ninth Circuit

13  has stated, in dicta, that "dogs" broadly speaking can constitute dangerous weapons "in the proper

14  circumstances."  *United States v. Dayea*, 32 F.3d 1377, 1379 (9th Cir. 1994).  But *Dayea* did not

15  involve a trained police dog.  And, in the Fourth Amendment context, courts have held that "the

16  likelihood of death from the use of a properly trained police dog … [is] sufficiently remote as to

17  preclude its characterization as deadly force."  *Aery v. Nohre*, 688 F. Supp. 3d 862, 874 (D. Minn.

18  2023) (dispensing with assertion that a police canine "is considered a deadly weapon").

19              **2.      Three-Level Enhancement Under § 2A2.2(b)(3)(A) (Bodily Injury)**

20                      **Should Not Apply**

21         Mr. Amiri also objects to the three-level enhancement under U.S.S.G. § 2A2.2(b)(3)(A) for

22  infliction of bodily injury.  Similar to Mr. Amiri's contention regarding the dangerous weapon

23  enhancement, the jury did not make a specific finding that bodily injury occurred, only that either

24  bodily injury or use of a dangerous weapon was present.  Applying both enhancements based on a

25  single ambiguous jury finding is improper under federal sentencing law.

26         Moreover, applying both enhancements in tandem would constitute *double counting*, which

27  the Guidelines prohibit when the same conduct is used to support multiple increases to the offense

28  level.  Here, the Government appears to rely on a single course of conduct, specifically the

1  deployment of a K-9 that allegedly caused injury, to support both the four-level weapon

2  enhancement and the three-level injury enhancement.  Using the same factual basis to apply

3  cumulative enhancements unjustly inflates the Guidelines range and results in a punishment not

4  anchored in distinct factual findings.

5       Given the ambiguity in the jury's verdict and the absence of clear, independent findings for

6  each enhancement, the cumulative application of both should be rejected.  At most, only one

7  enhancement, either for use of a dangerous weapon or for bodily injury, could be considered, and

8  only if it is independently and adequately supported by the record.

9       **3.    Six-Level Enhancement Under § 2H1.1(b)(1) (Color of Law) Should Not**

10           **Apply**

11      Mr. Amiri respectfully objects to the application of the six-level enhancement under

12  U.S.S.G. § 2H1.1(b)(1), which increases the offense level by six points where the defendant acted

13  under color of law.  In this case, applying the enhancement constitutes impermissible double

14  counting because "acting under color of law" is not merely incidental to the offense but is an

15  essential element of the conviction under 18 U.S.C. § 242.

16      The Ninth Circuit has long held that it is improper to impose an enhancement for conduct

17  that forms a necessary element of the offense of conviction.  *See United States v. Smith*, 719 F.3d

18  1120, 1123–25 (9th Cir. 2013); *United States v. Hornbuckle*, 784 F.3d 549, 553 (9th Cir. 2015).  As

19  the jury was explicitly instructed, to convict under § 242, the government was required to prove

20  beyond a reasonable doubt that the defendant acted under color of law.  The jury instructions

21  defined this as exercising authority granted by state, federal, or local law, even when abused.  *See*

22  Dkt. 369 at 25–26.  This element was fully litigated and found by the jury beyond a reasonable

23  doubt. Applying a sentencing enhancement for the same conduct thus duplicates what has already

24  been accounted for in both the base offense level and the statutory elements.

25      The government may argue that the enhancement addresses the defendant's abuse of

26  authority as a public official.  While the Ninth Circuit has upheld enhancements in circumstances

27  where they addressed distinct conduct beyond the offense itself (see *United States v. Reese*, 2 F.3d

28  870, 895 (9th Cir. 1993); *United States v. Narte*, 197 F.3d 959, 962 (9th Cir. 1999)), those cases are

1  factually distinguishable.  In *Reese* and *Narte*, the enhancements applied to conduct that extended

2  beyond the statutory elements or base offense level.  Here, by contrast, the sole basis for the

3  enhancement is the defendant's status as a law enforcement officer which is the very status required

4  to prove the offense under section 242.  There is no evidence or allegation of additional conduct

5  that would independently justify the enhancement under § 2H1.1(b)(1).

6     Ultimately, this Court must assess whether the Sentencing Commission intended

7  § 2H1.1(b)(1) to apply in cases where the defendant's status as a government actor is already an

8  element of the offense.  The structure of the Guidelines demonstrates that the Commission did not

9  intend for the same conduct to be punished twice.  Where the defendant's conduct under color of

10 law is the very foundation of the offense, the enhancement serves no distinct punitive purpose and

11 violates both the internal coherence of the Guidelines and controlling Ninth Circuit precedent.  *See*

12 *United States v. Harrington*, 946 F.3d 485, 488–90 (9th Cir. 2019); *Hornbuckle*, 784 F.3d at 553.

13    Moreover, the application of the six-level enhancement has a significant and

14 disproportionate impact on the defendant's advisory sentencing range.  Without the enhancement,

15 the defendant's total offense level would be 23, and given a Criminal History Category I, the

16 advisory Guidelines range would be 46 to 57 months.  With the enhancement, that range escalates

17 dramatically, potentially recommending a sentence far in excess of what is necessary to satisfy the

18 purposes of sentencing under 18 U.S.C. § 3553(a).  This further underscores the importance of

19 ensuring that the enhancement is not applied in a manner that constitutes impermissible double

20 counting.

21        **4.    Mr. Amiri Should Receive an Acceptance-of-Responsibility Reduction**

22    Mr. Amiri respectfully objects to the Presentence Report's refusal to apply a reduction for

23 acceptance of responsibility under U.S.S.G. § 3E1.1 based solely on his decision to exercise his

24 constitutional right to trial. Denial of this reduction—particularly of the one-level decrease under

25 § 3E1.1(b)—constitutes an unconstitutional trial penalty that contravenes the Sixth Amendment and

26 undermines the integrity of the sentencing process.

27    Under § 3E1.1(a), a two-point reduction may be awarded if the defendant "clearly

28 demonstrates acceptance of responsibility for his offense."  Section 3E1.1(b) provides an additional

1    one-point reduction if the defendant has "assisted authorities in the investigation or prosecution of

2    his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby

3    permitting the government to avoid preparing for trial." However, this third point requires a formal

4    motion from the Government and is typically unavailable to defendants who proceed to trial,

5    regardless of whether they acknowledge their conduct or express remorse at sentencing.

6        Denial of the one-point reduction under § 3E1.1(b) is unconstitutional because it effectively

7    punishes defendants for asserting their fundamental right to trial. As recognized by the Southern

8    District of New York in *United States v. Tavberidze*, No. 23-cr-585-03 (JSR), 2025 WL 748354, at

9    *4 (S.D.N.Y. Mar. 10, 2025), this framework violates the Sixth Amendment by penalizing the

10   exercise of a protected right and delegating sentencing discretion to the Government through its

11   exclusive authority to trigger the § 3E1.1(b) reduction. *See id.* Accordingly, the Court concluded

12   that in "every case in which a defendant chooses to go to trial but is convicted by a jury …, the

13   formal calculation of the offense level must be reduced by one point, because the effect of not

14   giving the one-point reduction to someone who chose to exercise … his right to go to trial rather

15   than save the Government some time and money is effectively an unconstitutional penalty on all

16   who made that choice." *Id.*, at *6.

17       The *Tavberidze* Court did not reach the question whether the two-point reduction authorized

18   by § 3E1.1(a) "for those who plead guilty and thereby allegedly show their remorse is nonetheless

19   itself an unconstitutional penalty" because it opted to apply the full three-point reduction, despite

20   the defendant having gone to trial, citing its discretion to vary from the Guidelines on the basis of a

21   policy disagreement. *See Tavberidze*, 2025 WL 748354, at *6 ("It is, of course, well settled that

22   courts have considerable discretion to vary from the Guidelines based, not only on circumstances

23   pertaining to the individual defendant, but also 'solely on policy considerations' and disagreements

24   with the Commission's views." (citing *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)).

25       Other Courts have likewise declined to follow the acceptance-of-responsibility framework

26   on policy grounds. For instance, in *United States v. Abraham*, 498 F. Supp. 3d 175, 183 (D. Mass.

27   2020), the Court sentenced the defendant within the Guidelines range that would have applied had

28   he pled guilty and received the benefit of the three-point reduction. The Court cited a study finding

that, "after controlling for the two-to-three point reduction provided by section 3E1.1, defendants convicted at trial received a sixty-four percent longer sentence than similar defendants who pled guilty to similar crimes." *Id.* at 184.  The Court further observed that because a "mere three percent of defendants go to trial,"[6] the reduction "is the norm in all but a small subset of cases."  498 F. Supp. 3d at 184.  Accordingly, the Court was troubled by the fact that "had [the defendant] pled guilty, his guideline range would have been 210 –262 months—surely a hefty sentencing range 'sufficient, but not greater than necessary' to accomplish the goals of federal sentencing," but "**[s]olely because he went to trial,**" the range was  292–365 months." *Id.* at 185 (emphasis in original).  The Court held, "This simply cannot be.  These strikingly disparate sentencing ranges (which do not even come close to overlapping) simply do not square with the statutory mandate— 'sufficient, but **not greater than necessary**'—where the Commission counsels that the huge bulk of similarly situated defendants ought be sentenced within the lower range.  This Court varied downward to sentence [the defendant] to 262 months in prison.  Not everything that is constitutional is just." *Id.* (emphasis in original).

Here, Mr. Amiri's decision to contest legal and factual issues at trial should not preclude recognition of his acceptance of responsibility, particularly given that he has expressed genuine remorse and acknowledged the impact of his conduct.  *See* PSR at 14–16 ¶ 43; *see also infra* § III.B.3.b.  Automatically denying the reduction based on trial participation transforms § 3E1.1(b) into a coercive tool that chills the exercise of the right to trial and results in sentencing disparities based on the assertion of constitutional rights. Accordingly, Mr. Amiri urges this Court to exercise its discretion to reject the policy underlying § 3E1.1, find that its application constitutes an impermissible trial penalty, and apply the full three-point reduction for acceptance of responsibility based on the totality of circumstances.  Doing so ensures both a just sentence and fidelity to constitutional principles.

---

[6] This remained true in fiscal year 2024.  *See* U.S. Sentencing Comm'n, 2024 Annual Report, *available at* https://www.ussc.gov/about/annual-report-2024.

**B.**     **The Section 3553(a) Factors Support a Sentence Substantially Below the Advisory Guidelines Range**

    **1.**     **Mr. Amiri's History of Service & Generosity Support a Below-Guidelines Sentence**

        Mr. Amiri is a first-time offender.  His past and his character—as reflected in his personal history and the dozens of letters submitted in his support (*see supra* § II.A)—demonstrate that his offense conduct was a deviation from a life of hard work, service, and compassion.  *See* 18 U.S.C. § 3553(a)(1); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (imposing a below-Guidelines sentence based on personal characteristics of defendant and explaining "the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence. And how could it be otherwise, for on this day of judgment, must not one judge the man as a whole?"); *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006) ("[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

        Courts in other cases have exercised their discretion to impose non-Guidelines sentences where the defendants have a long, documented history of generosity and community service, like Mr. Amiri does.  *See, e.g.*, *Gupta*, 904 F. Supp. 2d at 353 (premising downward variance, in part, on defendant's "big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact"); *Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x. 93 (2d Cir. 2008) (premising downward variance, in part, on letters from "persons from all walks of life . . . attesting, from personal knowledge, to [defendant's] good works and deep humanity" and his "generosity of spirit") (internal quotation marks omitted).  Similar considerations are present here.  *See supra* § II.A.

    **2.**     **Mr. Amiri's PTSD & Struggles with Alcohol, as a Result of Significant Workplace Stressors, Support a Below-Guidelines Sentence**

        Mr. Amiri asks this Court to consider the extraordinary occupational stressors associated with policing in the City of Antioch—stressors which exceed the typical burdens faced by law

DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM

1  enforcement in other jurisdictions—and their impact on Mr. Amiri's mental health, including a

2  PTSD diagnosis.  *See* PSR ¶¶ 91–98 (detailing experiences that took a heavy toll on Mr. Amiri's

3  mental health, "including responding to over 50 calls involving dead victims").  A below-

4  Guidelines sentence is appropriate in light of those stressors, as Probation recognizes.  *See* PSR at

5  39 (noting "significant number of traumatic events [Mr. Amiri] was exposed to over the course of

6  his career as a police officer … and the difficult and dangerous environment he appears to have

7  worked within"); *see also*, *e.g.*, *United States v. Oliver*, 608 F. Supp. 3d 1113, 1115 (M.D. Ala.

8  2022) (defendant, a former correctional officer, received below-Guidelines sentence of 30 months

9  on two counts of deprivation of rights for "beat[ing] two incarcerated men while their hands were

10  cuffed behind their backs" where defendant was diagnosed with PTSD from his working conditions

11  and explained his symptoms to the evaluating psychologist as follows: "I couldn't turn it off, my

12  mind would not stop thinking about that job.  I couldn't rest … I started drinking heavily to try to

13  shut it down.  I wasn't able to sleep because I was always so wired up and I didn't realize what was

14  going on.").

15        The conditions in which Mr. Amiri worked in the City of Antioch (*see supra* § II.B) are not

16  ordinary law enforcement conditions.  They constitute extreme, sustained stress and cumulative

17  trauma, all of which influenced the culture and environment at the Antioch Police Department, and

18  resulted in Mr. Amiri receiving a PTSD diagnosis.  The Court may properly consider these

19  circumstances in evaluating Mr. Amiri's mental state, decision-making, and the broader context in

20  which the offense conduct occurred.

21        **3.    A Guidelines Sentence Is Not Necessary to Achieve Just Punishment**

22        Mr. Amiri participated in serious offenses that merit punishment.  However, a sentence

23  within the Guidelines range or Probation's recommended sentence of 60 months would be "greater

24  than necessary" to "promote respect for the law[] and to provide just punishment for his conduct."

25  18 U.S.C. § 3553(a), (a)(2).

DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM

1

2

3

4

       a.      <u>**Post-Offense Consequences:**</u> **Mr. Amiri Has Suffered and,**

             **Regardless of the Court's Sentence, Will Continue to Suffer**

             **Significant Personal and Professional Consequences As a Result**

             **of His Prosecution and Convictions.**

5       Even before this Court sentences Mr. Amiri, he has had to suffer through the life-changing

6  personal and professional consequences of his actions. Most of those consequences will continue

7  long after he has completed whatever sentence the Court may impose, some for the rest of his life.

8  On August 17, 2023, the Indictments in the 264 and 269 Cases were unsealed. Extensive press

9  coverage at the local and national levels followed and has continued through the present. A

10  representative article was published on August 28, 2023, by *Rolling Stone* magazine, titled,

11  "Sadistic California Cops Bragged About 'Violating Civil Rights,'" with Mr. Amiri's picture front

12  and center. The article refers to the Indictment as "present[ing]" Mr. Amiri's "sadism … in

13  excruciating detail" and "paint[ing] a dark picture of an officer once touted by the department as an

14  East Bay native, fluent in Farsi, and passionate about 'serving' his community."[7] The emotional

15  impact of this demonizing and one-sided media coverage has been crushing. Mr. Amiri has had to

16  endure public humiliation in his professional and social communities, and he has had to watch his

17  family endure the same, knowing that their suffering is his fault. *See* Ltr. No. 9 (Friend) at 2 ("The

18  negative effect of this case has caused [Mr. Amiri] great remorse and shame, especially because of

19  the distress of his family.").

20       As a result of the highly publicized and sensationalized prosecution of Mr. Amiri, many of

21  Mr. Amiri's former colleagues with the Brentwood and Antioch Police Departments, who have

22  positive memories of Mr. Amiri as a fellow officer and friend, fear that they will face adverse

23  consequences if they express support for him in connection with these proceedings. One such

24  officer writes:

25

26

27

[7] Tim Dickinson, *Sadistic California Cops Bragged About 'Violating Civil Rights*,' Rolling Stone, Aug. 28, 2023, *available at* https://www.rollingstone.com/politics/politics-features/antioch-cops-morteza-amiri-eric-rombough-devon-wenger-1234812466/.

28

DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM

1

2

3

4

5

> I first met Morteza when he served as a police officer with the Brentwood Police Department.  During that time, he became both a mentor and a friend.  As I was beginning my own career in law enforcement, Morteza devoted countless hours to guiding, training, and encouraging me.  He frequently took me on ride-alongs, providing real-world experience and insight into the responsibilities of a police officer. During those shifts, I witnessed Morteza treat members of the community with the utmost respect. He was professional, compassionate, and highly skilled—one of the most proactive officers in the department. His mentorship was instrumental in shaping my early development and reinforcing the values of integrity and service.

6

7      Ltr. No. 21 (Anonymous Antioch Police Department Officer; Mentee).  Despite Mr. Amiri's

8      positive impact on this officer's career, the officer requested to "submit this letter anonymously,

9      without reference to [their] current agency or assignment, out of concern for potential professional

10     repercussions."  *Id.*  Mr. Amiri will have to live with this stigma for the rest of his life.

11          Shortly after the Indictments were unsealed, the Antioch Police Department placed Mr.

12     Amiri on administrative leave.  Around that time, two providers diagnosed Mr. Amiri with PTSD

13     stemming from his police work.  *See* PSR ¶ 91; *see also supra* § II.B.  In October 2023, Mr. Amiri

14     was terminated from his lifelong dream job.  *See* PSR ¶ 104; *see also* Ltr. No. 11 (Wife).  Mr.

15     Amiri's California POST certification, which established his eligibility to serve as a police officer

16     under California law, was also revoked in June 2025 as a result of his wire fraud convictions.[8]  Mr.

17     Amiri will never be a police officer again.  In other words, the dream career that he worked

18     tirelessly to attain since adolescence is lost to him forever, and he has had to start a different career

19     from scratch.

20          Sentencing courts routinely consider the kind of substantial personal and professional

21     consequences Mr. Amiri has faced in imposing below guidelines sentences. *See, e.g.*, *United States

22     v. Britt*, 27 F. App'x 862, 865 (9th Cir. 2001) (affirming below guideline sentence in part based on

23     collateral consequences of conviction, including permanent damage to defendant's career); *United

24     States v. Vigil*, 476 F. Supp. 2d 1231, 1316 (D.N.M. 2007) *aff'd*, 523 F.3d 1258 (10th Cir. 2008)

25

26     [8] *See* Cal. Comm'n on Peace Officer Standards and Training, *Peace Officer Certification Actions*,
       *available at* https://post.ca.gov/Peace-Officer-Certification-Actions (explaining that a "revoked"
27     certification status means the officer "has been disqualified from eligibility to be a peace officer
       based on a disqualifying event as set forth in [California] Government Code section 1029").
28

1    (imposing below-Guidelines sentence in part because "it is highly unlikely

2    that [the defendant] will be able to attain another position that will allow him to commit a similar

3    crime."); *United States v. Redemann*, 295 F.Supp.2d 887, 897 (E.D. Wis. 2003) (below-Guidelines

4    sentence appropriate where defendant suffered substantial adverse publicity and personal, business,

5    and family consequences that would deter future misconduct).

6                    b.    <u>Post-Offense Conduct:</u> **Mr. Amiri Has Demonstrated an**

7                          **Unflagging Commitment to Rehabilitation and Deep Remorse**

8              Following his termination from the police department, Mr. Amiri did not succumb to "the

9    emotional weight of losing the career he had always dreamed of retiring from," but rather

10   "redirected his focus toward building a stable future for his loved ones."  Ltr. No. 1 (Mother) at 6.

11   Specifically, he buckled down and built a real estate investment business with his wife.  *See* PSR

12   ¶ 104.  Probation's Sentencing Recommendation credits Mr. Amiri for having done so, stating, "It

13   appears meaningful that the defendant and his wife ha[ve] already begun working on an alternate

14   avenue toward financial security, in the form of a real estate business they hope will be their means

15   to support their family into the future."  PSR at 39.  Multiple letters of support also commend Mr.

16   Amiri's resilience and resolve in embarking on a new career in an unfamiliar field when his identity

17   had been tied up in police work for so long.[9]

18             Mr. Amiri has developed meaningful and strong professional relationships since changing

19   career paths, and several of his colleagues have written letters in his support.  One colleague writes:

20                    Working with Morteza flipping houses has been a very positive experience,
                      I have had the luxury of seeing how he cares for the sellers, buyers,
21                    employees and subcontractors that we work with.  One moment I'll never
                      forget was during a particularly stressful project when several of our team
22                    members were overwhelmed.  Rather than focusing solely on his own
                      responsibilities, Teza stepped up to support everyone.  He stayed late,

23

_____

24   [9] *See, e.g.*, Ltr. No. 11 (Wife) at 3 ("Despite the devastating loss of his police career, Morteza has
     shown incredible resilience.  He is  hardworking individual who puts 110% into everything he does.
25   After his career in law enforcement ended, he didn't give up.  Instead, he pivoted and started a new
     career."); Ltr. No. 2 (Cousin) at 2 ("I watched in awe as he transitioned into a completely new field,
26   real estate ... [R]ather than wallow in self pity or denial, he took immediate action.  He pivoted.  He
     adapted.  And not only did he learn, he excelled.  … I watched as he absorbed information at an
27   incredible pace, making connections, solving problems, moving forward. … I wish I had a fraction
     of that drive and clarity.").

28

offered help, and kept morale high—not because he was asked to, but because that's just who he is.

Ltr. No. 19 (Real Estate Colleague; Friend) at 1.  Another writes:

Over the past year and a half, Morteza and I have completed multiple real estate transactions together.  During this time, I've come to know him as someone who is honest, fair, and incredibly generous.  In an industry where negotiations and commissions are often strictly transactional, Morteza has consistently gone above and beyond to ensure I was treated well.

Ltr. No. 18 (Real Estate Colleague; Friend) at 1.

In addition to building a new career, Mr. Amiri has, "[t]o his credit," made other strides toward "effect[ing] a better future for himself and his family," as Probation observes.  PSR at 39. He stopped drinking alcohol in July 2024, having recognized that he had been misusing it since approximately 2020 as a way to cope with his mental health challenges. *See id.* ¶ 101.  Mr. Amiri recognizes the importance of maintaining his sobriety and believes that participation in substance abuse treatment would provide him with the necessary support to avoid relapse and continue developing healthier coping mechanisms.  *See id.*

Following the verdict in the 269 Case, Mr. Amiri was remanded to custody pending sentencing on March 18, 2025.  During his roughly three months in custody, Mr. Amiri has been confined to a solitary jail cell for 21 hours a day to protect him from security risks posed to former law enforcement officers in a general population setting.  Because of his status as a former police officer, he does not have a cellmate and is not permitted to eat meals or otherwise socialize with inmates—within the jailhouse or on the yard.  He receives meals through a slot in his cell door.

Being physically apart from his wife, 18-month-old daughter, and four-year-old son during this period has also devastated him.  He worries about his wife having to raise and care for their children without him, particularly given her ongoing health issues.  *See* PSR ¶ 87.  And because Mr. Amiri grew up without his father in his life, it has been especially difficult for him to reckon with the fact that his conduct has deprived his children of his presence.  *See* PSR at 15 (quoting Mr. Amiri: "Already, my four-year-old son … has visited me in jail and asked why he cannot be on my side of the glass.  There will be many more painful moments like that going forward.");  Ltr. No. 1 (Mother) at 6 ("I hadn't expected to feel such a familiar ache, reliving a chapter of my life where

1   my own son grew up without his father present. … To see his children, so small and full of hope,

2   waiting by the window with tearful eyes, counting the seconds like fragile prayers, just to hear the

3   sound of his footsteps at the door.").

4          Despite these challenging circumstances, Mr. Amiri has strived to be productive while in

5   custody.  He has completed over a dozen courses in an effort to develop skills to become a better

6   parent, businessman, and person, including but not limited to: (1) Parenting While Incarcerated, (2)

7   Learn Your Strengths from Shining Light, (3) Neil deGrasse Tyson Teaches Scientific Thinking

8   and Communication, (4) Anger Management, (5) Rising Strong: A Substance Use Recovery

9   Course, (6) Learning How to be a Better Parent, (7) SquareUp – Entrepreneurship, (8) Introduction

10  to Artificial Intelligence, (9) A Guide Through the 12 Steps of Recovery, (10) Howard Schultz

11  Business Leadership, (11) Developing Your Emotional Intelligence, (12) Embracing Unexpected

12  Change, (13) Unconscious Bias, (14) Building Resilience, and (15) Critical Thinking for Better

13  Judgment and Decision-Making.  *See* PSR ¶ 103.  While in custody, Mr. Amiri has also requested

14  mental health support.  Initially, he was offered only medication by the jail psychiatrist.  *See id.*

15  ¶ 99.  More recently, to treat his PTSD, he has been able to meet with a Santa Clara County

16  Behavioral Health Team clinician, Dr. Richard Bata, a Ph.D. and MFT who practices trauma

17  therapy and crisis intervention, and he has found these sessions helpful.  Mr. Amiri would like to

18  continue receiving mental health counseling going forward.  *Id.*

19         In advance of his sentencing, Mr. Amiri has also accepted responsibility for the offense

20  conduct in both cases.  *See* PSR ¶ 43, at 14–16.  With respect to the 269 Case, Mr. Amiri extends

21  his sincere apologies to A.A. for the injuries he suffered and the lasting impact of his encounter

22  with law enforcement.  *Id.*  Mr. Amiri acknowledges that over time, his judgment as an Antioch

23  police officer became shaped by the prevailing culture within the department.  Consequently, he

24  failed to properly distinguish between effective law enforcement and causing harm.  He admits that

25  the stress of the job, combined with the influence of that culture, impaired his decision-making.

26  Upon reflection, Mr. Amiri now recognizes the harm that such decisions caused, not only to A.A.,

27  but also to himself, his colleagues, and the broader community.  *Id.*

28         With respect to the 264 Case, Mr. Amiri had made a full and frank admission that he made a

31

1    horrible decision to pay a close friend to complete his college coursework toward a Bachelor's

2    degree and to subsequently apply for a 2.5% pay raise from the City of Antioch on the basis of

3    having received a Bachelor's degree that he did not earn.  *See* PSR at 14.  In November 2024, Mr.

4    Amiri deposited $10,526 into the Registry of the Clerk of Court as restitution to the City of Antioch

5    for the amount of educational incentive pay he received as a result of the wire fraud scheme.  *See*

6    PSR at 38; *see also* Dkt. 411.

7         Mr. Amiri is "deeply disappointed" in himself and recognizes that his behavior has had, and

8    will continue to have, a negative impact on many, including the community that it was his lifelong

9    dream to serve, because he violated the public's trust and contributed to negative public perceptions

10   of law enforcement.  PSR at 15.  He also acknowledges that he has caused his innocent family

11   members tremendous harm and suffering.  *Id.*  He further understands that, as a result of his

12   conduct, his wife will have to shoulder the burden of taking care of their children without her

13   partner, and his children will endure the hurt and confusion of not having their dad around.  *Id.*

14        In light of the proactive steps Mr. Amiri has taken since the offense, and the candor with

15   which he discussed his personal history during the presentence interview, the U.S. Probation

16   Officer recognizes that Mr. Amiri has "exhibited significant insight in discussing his mental health

17   [and] his history of difficult experiences as a police officer."  *PSR* at 39.  His willingness to engage

18   in mental health treatment, his transparency regarding substance use, and his meaningful progress

19   toward rehabilitation reflect a sincere and ongoing commitment to accountability and personal

20   change.

21        Such post-offense rehabilitative efforts are a relevant and compelling consideration under 18

22   U.S.C. § 3553(a).  The Ninth Circuit has recognized that post-offense rehabilitation—distinct from

23   post-sentencing rehabilitation—may, in appropriate cases, justify a downward departure.  In *United*

24   *States v. Tzoc-Sierra*, 387 F.3d 978, 979 (9th Cir. 2004), the court explained that a downward

25   departure on this basis must rest on a finding that the defendant's rehabilitation is extraordinary,

26   and that the court must articulate why the efforts are present to an atypical degree.

27        Here, Mr. Amiri's sustained efforts to address the underlying issues that contributed to his

28   offense conduct, particularly through voluntary treatment and self-reflection, meet this standard.

His actions go beyond mere compliance and demonstrate a meaningful transformation that merits consideration in determining a just and proportionate sentence.

### c.    Mr. Amiri Faces a Heightened Risk of Harm and More Difficult Conditions of Confinement in BOP Custody Due to His Public Notoriety and Law Enforcement Background

As the Supreme Court recognized in *Koon v. United States*, 518 U.S. 81 (1996), a downward departure is appropriate where a defendant—particularly one with a law enforcement background—faces heightened susceptibility to abuse in custody due to extraordinary notoriety.

In *Koon*, the Court found that "extraordinary notoriety and national media coverage" placed the defendants at particular risk of abuse, justifying a reduced sentence. *Id.* at 112. The same considerations apply here. Mr. Amiri has been subject to intense, often emotionally charged media coverage, public condemnation, and high-profile commentary. *See supra* § III.B.3.a. Combined with his prior role as a police officer, this level of visibility exposes him to a serious and well-documented risk of targeted violence and social isolation in prison.

As a former law enforcement officer, Mr. Amiri is likely to be placed in a special housing unit—housing units that are "securely separated from the general inmate population" to ensure the "safety, security, and orderly operation of correctional facilities." *See* BOP Program Statement 5270.11; *see also* BOP Program Statement 5270.07 (inmates eligible for protective custody include former law enforcement officials). Notwithstanding the protective aims of special housing units, it is well-documented that segregation from the general population causes inmates "serious mental anguish." Niki Hakimzadeh, *You're Not Alone: Reconceptualizing Solitary Confinement from the Default Punishment to A Last Resort by Focusing on Mental Health*, 2025 U. Ill. L. Rev. 681, 699 (2025); *see also id.* at 702 ("The National Alliance on Mental Illness conducted a study that found individuals subject to solitary were 24% more likely to die in the first year after release, 78% more likely to die from suicide, and 54% more likely to die from homicide than prisoners who did not experience solitary. Individuals who spent time in solitary were also 127% more likely to die from an opioid overdose within just two weeks after their release."). Accordingly, where a defendant could end up serving a substantial portion of his sentence in some form of segregation—and indeed

1  has been segregated while awaiting sentencing, as Mr. Amiri has been here—leniency is

2  appropriate.

### 4. A Guidelines Sentence Is Not Necessary to Protect the Public or for Specific Deterrence.

5  A Guidelines sentence is not necessary to either protect the public from Mr. Amiri or to

6  deter him from committing future offenses.[10]  Mr. Amiri's status as a first-time offender make him

7  less likely to recidivate, less of a threat to the community, and make each year of incarceration that

8  much more devastating and unnecessary as a form of punishment.[11]

9  There is no reason to believe Mr. Amiri would commit another offense like the ones for

10  which he is being sentenced—or that he will ever be in a position to do so.  Prior to being remanded

11  to custody following his conviction in the 269 Case, he had been out of custody, with a perfect

12  pretrial services record, for over one year.  He will never work again in law enforcement.  *See supra*

13  § III.B.3.a.

14  More to the point, Mr. Amiri recognizes that what he did was wrong, is genuinely

15  remorseful, and, regardless of what this Court does, he has and will suffer significant consequences

16  for his crimes.  On top of all of that, Mr. Amiri will now live with a felony record. Independent of

17  any sentence the Court imposes, a felony record brings with it such "broad ranging" collateral

18  consequences—including on a defendant's "economic, political, and social rights"—that some

19  courts have referred to it as a "modern civil death."  *United States v. Nesbeth*, 188 F.Supp.3d 179,

20  182 (E.D.N.Y. 2016).  Adding to this a Guidelines sentence of 87 to 108 months or U.S.

21  Probation's recommended sentence of 60 months is not necessary to achieving the government's

22  interest in specific deterrence.  Given the severe collateral consequences that this conviction has

---

24  [10] Social science research makes clear that "across all offenders, prisons do not have a specific

25  deterrent effect." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S, 60S (2011).

26  [11] *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing*

27  *Guidelines* at 6–7, U.S. Sentencing Comm'n, May 2004 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

28  publications/2004/200405_Recidivism_Criminal_History.pdf).

1   wrought, Mr. Amiri is more than amply deterred from ever engaging in such conduct again.

2   **IV.    CONCLUSION**

3          Given the mitigating factors in this case and the reasons set forth above, counsel for Mr.

4   Amiri requests the Court impose a sentence of no greater than 48 months.

5

6

7   DATED:  June 16, 2025

_____
JANELLE F. CRANDELL
PAUL Q. GOYETTE
8   Attorneys for Defendant,
MORTEZA AMIRI
9   (Case No. 23-CR-00269-JSW)

10

11

12  DATED:  June 16, 2025

_____
TIMOTHY P. CRUDO
13  Attorney for Defendant,
MORTEZA AMIRI
14  (Case No. 23-CR-00264-JSW)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM