TIMOTHY P. CRUDO (State Bar No. 143835)
RACHEL R. SUHR (State Bar No. 323531)
OLIVER W. HAMILTON (State Bar No. 340054)
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104-5500
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email:     ef-tpc@cpdb.com
           ef-rrs@cpdb.com
           ef-owh@cpdb.com

Attorneys for Defendant
MORTEZA AMIRI
(Case No. 4:23-cr-00264-JSW)

Paul Q. Goyette (SBN 137250)
Janelle F. Crandell (SBN 224994)
GOYETTE, RUANO & THOMPSON, INC.
A Professional Law Corporation
2366 Gold Meadow Way, Suite 200
Gold River, CA  95670
Ph: (916) 851-1900
Fax: (916) 851-1995
Email:  Paul@grtlaw.com
Attorneys for Defendant,
MORTEZA AMIRI
(Case No. 4:23-cr-00269-JSW)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MORTEZA AMIRI,<br><br>Defendant. | Case No. 4:23-cr-00264-JSW;<br>Case No. 4:23-cr-00269-JSW<br><br>**REPLY BRIEF IN SUPPORT OF DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM**<br><br>Judge:    Hon. Jeffrey S. White<br>Date:     Tuesday, June 24, 2025<br>Time:     1:00 p.m.<br>Crtrm.:   5, 2nd Floor |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT ......................................................................................................1

        A.      There Is No Basis for Adding Two Points to Mr. Amiri's Offense
                Level for "More Than Minimal Planning" .......................................................1

        B.      The Government's Recommended Sentence of 97 Months Is Greater
                Than Necessary to Achieve Just Punishment & Respect for the Law ...........3

                1.      The Government Overstates the Offense Conduct in the 269
                        Case by Detailing Conduct Underlying the Acquitted
                        Conspiracy Count ................................................................................3

                2.      The Government Exaggerates the Nature & Circumstances of
                        the Offense Conduct in the 264 Case ...................................................6

                3.      The Government Disregards Personal History & Post-Offense
                        Rehabilitation Efforts that Call for a Below-Guidelines
                        Sentence ................................................................................................7

                4.      The Government Ignores Mr. Amiri's Remorse and
                        Accountability for the Offense Conduct ..............................................8

                5.      Grouping Does Not Support the Imposition of a Higher
                        Sentence ................................................................................................9

III.    CONCLUSION ................................................................................................11

**REPLY BRIEF ISO DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Jones v. United States,*
   574 U.S. 948 (2014) ................................................................................................................... 4

*McClinton v. United States,*
   143 S. Ct. 2400 (2023) ......................................................................................................... 4,5,6

*United States v. Bell,*
   808 F.3d 926 (D.C. Cir. 2015) ................................................................................................ 4

*United States v. Canania,*
   532 F.3d 764, 778 (8th Cir. 2008) .......................................................................................... 5

*United States v. Sabillon-Umana,*
   772 F.3d 1328 (10th Cir. 2014) .............................................................................................. 4

*United States v. Settles,*
   530 F.3d 920 (D.C. Cir. 2008) ............................................................................................... 4

*United States v. Tapia,*
   59 F.3d 1137 (11th Cir. 1995) ................................................................................................ 2

*United States v. Watts,*
   519 U.S. 148 (1997) ................................................................................................................ 4

**Statutes & Rules**

18 U.S.C. § 3553(a) ..................................................................................................................... 1, 11

18 U.S.C. § 3553(a)(1), (2)(a) ............................................................................................................ 7

U.S.S.G. § 1b1.3 .................................................................................................................................. 4

U.S.S.G § 2A2.2(b)(1) .................................................................................................................... 1, 2

U.S.S.G. § 3D1.4 ................................................................................................................................. 9

## I.   INTRODUCTION

The government recommends that Mr. Amiri receive a custodial sentence of 97 months—37 more months than what U.S. Probation has recommended.  For the reasons stated below and in Mr. Amiri's Sentencing Memorandum, that recommendation should be rejected for at least two reasons: First, it is premised on a miscalculation of the Guidelines range as 97 to 108 months—higher than Probation's Guidelines calculation of 87 to 108 months, which is also erroneous for the reasons stated in Mr. Amiri's Sentencing Memorandum.  Second, 97 months is "far greater than necessary" to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a).  The government's arguments to the contrary rely on mischaracterizations or exaggerations of Mr. Amiri's offense conduct and fail to  take into account his personal history and characteristics, including his status as a first-time offender, his commitment to public service before, during, and after his law enforcement career, his sincere expressions of remorse, and his productive rehabilitation efforts following the offense conduct. Mr. Amiri respectfully submits that his custodial sentence should be no greater than 48 months.

## II.   ARGUMENT

### A.   There Is No Basis for Adding Two Points to Mr. Amiri's Offense Level for "More Than Minimal Planning"

During the pre-sentence interview process, the government asked U.S. Probation to add two points to its Guidelines calculation under U.S.S.G § 2A2.2(b)(1) for "more than minimal planning." After consideration of Mr. Amiri's objection to that enhancement as lacking a basis in the record, Probation removed those two points.  *See* PSR at 33.  The government continues to argue in its sentencing memorandum that the two-level enhancement should apply because Mr. Amiri "specifically sought out the situation for commission of the crime, and used the tools available to him as a police officer to commit the offense."  Dkt. 434 at 7:19–21.[1]  Probation landed on the right side of this issue—the record does not support a finding that Mr. Amiri's offense in the 269 Case involved "more than minimal planning" within the meaning of § 2A2.2(b)(1).

---

[1] The government's brief appears at Docket Number 484 in Case No. 4:23-cr-00269-JSW ("269 Case").  Unless otherwise specified, all docket references herein are to the docket in Case No. 4:23-cr-00264-JSW ("264 Case").

1    Section 2A2.2(b)(1) provides for a two-level enhancement "[i]f the assault involved more

2    than minimal planning."  In pertinent part, the Guidelines Commentary defines "more than minimal

3    planning" as "more planning than is typical for commission of the offense in a simple form."  *Id.*,

4    Application Note 2.  "For example, waiting to commit the offense when no witnesses were present

5    would not alone constitute more than minimal planning.  By contrast, luring the victim to a specific

6    location or wearing a ski mask to prevent identification would constitute more than minimal

7    planning."  *Id.*  To determine whether this enhancement applies, courts have looked for evidence

8    that the defendant "formulate[d] a sophisticated plan or an elaborate scheme."  *United States v.*

9    *Tapia*, 59 F.3d 1137, 1144 (11th Cir. 1995).

10    In Mr. Amiri's case, the record is devoid of evidence that would satisfy the Guidelines

11    standard for "more than minimal planning."  The incident involving Mr. Arroyo was singular and

12    reactionary, arising from a random field encounter.  The government's theory of planning rests

13    primarily on Mr. Amiri's statement to Officer Manly that he "wanted to get into something"

14    (Dkt. 434 at 7:21–23), but that remark is vague, generalized, and does not constitute planning.  There

15    is no evidence in the record that the texts with Officer Manly identified a particular individual,

16    outlined a strategy, or described steps to execute an actual physical act in a planned manner.  General

17    expressions of bravado, frustration, or banter do not meet the threshold established by the examples

18    and definition provided in the Guidelines. There is no evidence that Mr. Amiri identified Mr. Arroyo

19    in advance or took any affirmative steps to orchestrate the encounter.

20    To the extent the government also points to what Mr. Amiri did *during* his encounter with

21    Mr. Arroyo (Dkt. 434 at 7:26–28), none of that conduct demonstrates planning, which, by definition,

22    concerns steps taken to realize or achieve a desired future outcome.  The lack of planning is evident

23    in the fact that Officer Manly had to manually open the door to deploy the K-9 unit in response to

24    Mr. Amiri's spontaneous call for assistance.  Had the incident been premeditated or coordinated,

25    such a fundamental element would have been accounted for in advance.  The need for this on-the-

26    fly act further confirms that the use of force was reactive, not prearranged.

27    Moreover, while Mr. Amiri did utilize tools available to him as a police officer—namely, a

28    patrol vehicle and a K-9 unit—those are tools that Mr. Amiri had as part of his everyday job, not

**REPLY BRIEF ISO DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM**

1  tools he acquired in the planning of any offense, like the ski mask in the Guidelines example.

2  Indeed, every other K-9 officer had the same tools. The fact that he used the K-9 unit in the course

3  of a spontaneous encounter is not enough to constitute "more than minimal planning." Mr. Amiri's

4  conduct was an unplanned act that falls far short of that threshold.

5      Additionally, Mr. Amiri was exonerated of any conspiracy charge, further undercutting the

6  argument that this was a coordinated or pre-planned effort. Mr. Amiri's actions were reactionary,

7  isolated, and lacked the deliberation required. Accordingly, the Court should reject the

8  government's request to apply the two-level enhancement for more than minimal planning, as U.S.

9  Probation did.

10      **B.**    **The Government's Recommended Sentence of 97 Months Is Greater Than Necessary to Achieve Just Punishment & Respect for the Law**

11

12      The government acknowledges the existence of several, though not all, factors that support

13  a below-Guidelines sentence in this case, including that Mr. Amiri does not have a criminal history,

14  has demonstrated acceptance of responsibility by depositing $10,526 in the Court's Registry for

15  payment of victim restitution in the 264 Case, and had spent five years in a "difficult and often

16  dangerous job" when he committed the offense conduct. Dkt. 434 at 2:13–14, 8:6, 11:6–7.

17  Nevertheless, the government argues that a 97-month sentence is proper. That argument is not

18  persuasive.

19      **1.**    **The Government Overstates the Offense Conduct in the 269 Case by Detailing Conduct Underlying the Acquitted Conspiracy Count**

20

21      In its description of the offense conduct in the 269 Case, the government characterizes Mr.

22  Amiri as having engaged in a "pursuit of exacting extralegal punishment on suspects," citing not

23  only the one incident involving Mr. Arroyo but also conduct underlying the conspiracy count of

24  which Mr. Amiri was acquitted. Dkt. 434 at 5:19–6:1. Specifically, the government cites Mr.

25  Amiri's text messages with fellow officers and uncharged incidents with other suspects.

26      To the extent the government is asking the Court to consider conduct outside the bounds of

27  the offense involving Mr. Arroyo, such conduct should be assessed in light of the recent amendments

28  to § 1B1.3 of the U.S. Sentencing Guidelines, effective November 1, 2024. Subdivision (c) of

§ 1B1.3 now expressly excludes acquitted conduct from the scope of relevant conduct that may be considered in calculating a Guidelines sentence, providing: "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction."[2]

The Sentencing Commission amended § 1B1.3 in response to mounting concerns expressed by jurists, including at least nine Supreme Court justices,[3] about "the use of acquitted conduct to increase a defendant's sentence."[4]  Justice Sotomayor, joined by Justices Kavanaugh, Gorsuch, and Barrett, recently raised this issue in connection with the denial of certiorari in *McClinton*, 143 S. Ct. 2400.  In *McClinton*, the prosecutor had argued that the defendant "shot and killed his friend in a dispute over the proceeds of a pharmacy robbery."  *Id.* at 2401.  The jury acquitted the defendant of killing his friend and convicted him only of robbing the pharmacy.  *Id.*  "After that, however, something happened that might strike the average person as quite strange.  At McClinton's sentencing for the robbery conviction, the prosecution again argued that McClinton had killed his

---

[2] Application Note 10 adds that "[t]here may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction," but this is not such a case.

[3] *See, e.g., McClinton v. United States*, 143 S. Ct. 2400, 2400–03 (2023) (Justices Sotomayor, Kavanaugh, Gorsuch and Barrett); *Jones v. United States*, 574 U.S. 948 (2014) (Scalia, J., joined by Thomas and Ginsburg, JJ., dissenting from denial of certiorari) (opining that a sentencing judge cannot use acquitted conduct as "any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury. It *may not* be found by a judge.") (emphasis in original); *United States v. Watts*, 519 U.S. 148, 170 (1997) ( (Stevens, J., dissenting) ("The notion that a charge that cannot be sustained by proof beyond a reasonable doubt may give rise to the same punishment as if it had been so proved is repugnant to that jurisprudence."); *Id.* (Kennedy, J., dissenting) ("[T]o increase a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal."); *see also United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of reh'g en banc) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J.) ("It is far from certain whether the Constitution allows" a district judge to increase a defendant's sentence within the statutorily authorized range "based on facts the judge finds without the aid of a jury or the defendant's consent."); *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("To be sure, we understand why defendants find it unfair for district courts to rely on acquitted conduct when imposing a sentence.").

[4] *See* U.S. Sentencing Comm'n, Amendment 826, Reason for Amendment, *available at* https://www.ussc.gov/guidelines/amendment/826.

friend." *Id.* Justice Sotomayor observed that "the use of acquitted conduct to increase a defendant's

Sentencing Guidelines range *and sentence* raises important questions that go to the fairness and

perceived fairness of the criminal justice system." *Id.* at 2401 (emphasis added). In particular, she

expressed concern about "the lesson jurors learn from acquitted-conduct sentencing." *Id.* at 2403.

She recounted:

> One juror, after learning about acquitted-conduct sentencing, put it this way:
> 'We, the jury, all took our charge seriously. We virtually gave up our private
> lives to devote our time to the cause of justice . . . What does it say to our
> contribution as jurors when we see our verdicts, in my personal view, not
> given their proper weight. It appears to me that these defendants are being
> sentenced not on the charges for which they have been found guilty but on
> the charges for which the District Attorney's office would have liked them
> to have been found guilty.'

*Id.* (quoting *United States v. Canania*, 532 F.3d 764, 778 (8th Cir. 2008) (Bright, J., concurring)).

In a similar vein, the government's sentencing memorandum seeks "a second bite at the

apple with evidence that did not convince the jury" that Mr. Amiri conspired to deprive citizens of

their civil rights. *Id.* at 2402. Although the government does not explicitly reference the incidents

involving M.Z. or D.R., it does rely on conduct associated with the conspiracy charge—of which

Mr. Amiri was acquitted—to bolster its claim that the incident involving Mr. Arroyo was part of a

broader pattern of behavior by Mr. Amiri. During trial, the government introduced evidence of

several uncharged incidents and selected text messages to suggest that Mr. Amiri routinely engaged

in extrajudicial punishment, including in the incident involving Mr. Arroyo. However, the jury

rejected this theory by acquitting Mr. Amiri of conspiracy, necessarily finding that he was not

engaged in an organized effort or "manhunt" to harm suspects in his role as a police officer, as the

government continues to claim. Dkt. 434 at 4.

Accordingly, it is improper for the government to repurpose conduct related to the acquitted

conspiracy charge as "relevant conduct" in connection with sentencing on Mr. Amiri's conviction

for the incident involving Mr. Arroyo. The Court should limit its sentencing analysis to conduct

directly related to the specific offenses for which he was convicted, in accordance with the updated

U.S. Sentencing Guidelines, and to avoid the "procedural fairness and accuracy concerns" inherent

whenever a sentencing court considers acquitted-conduct. *McClinton*, 143 S. Ct. at 2402.

1

      **2.**      **The Government Exaggerates the Nature & Circumstances of the Offense Conduct in the 264 Case**

2

3       From the start, the government has tried to portray Mr. Amiri's fraud-related conduct as part

4 of a multi-million-dollar heist.[5]  But the trial testimony clearly established that the amount at issue

5 was relatively small.  Mr. Amiri received $10,526 in education incentive pay, of which he netted

6 less than $2,000 (pre-tax).  *See* PSR ¶ 22.

7       The government continues to overstate this charge at sentencing.  It does not challenge U.S.

8 Probation's loss amount calculation of $10,526.  *See* PSR ¶¶ 22, 47 (two-level increase for loss

9 amount exceeding $6,500 (citing U.S.S.G. § 2B1.1(b)(1)(B)); *see also* Dkt. 434 at 3–4.  But in

10 describing Mr. Amiri's offense conduct the government overstates the potential losses to the City

11 of Antioch, arguing, without any citation to the trial record, that but for the August 2023 indictment

12 Mr. Amiri "would have continued collecting wrongfully enhanced financial incentives from the City

13 of Antioch."  Dkt. 434 at 2:14–16.  That contention was completely disproven at trial.

14       The government called a forensic accounting expert to testify that Mr. Amiri theoretically

15 could have made an additional $78,366 in education incentive pay if he stayed with the Antioch

16 Police Department until he retired in 2047, but that opinion was undone by the actual evidence.

17 Government witness Trevor Schnitzius, a former Antioch Police Department captain, testified that

18 the City of Antioch's educational incentive program offered an identical 2.5% pay bump for anyone

19 with an Associate's degree and nine years of law enforcement experience and that in fact—not in

20 theory—Mr. Amiri (who had an Associate's degree) automatically would have received that bump

21 in or around December 2023, shortly after he was indicted.  *See* Dkt. 338 at 26:9–19, 31:11–32,

22 42:4–8, 49:12-23; *see also* Dkt. 434 at 3:3–5 (noting that Mr. Amiri joined the Antioch Police

23 Department "in November 2017, following approximately three years as an officer at the Brentwood

24 Police Department").  As explained in Mr. Amiri's Sentencing Memorandum (at 21–22), those facts

25

26

---

27

28

[5] For example, the government initially sought to introduce expert testimony that one of Mr. Amiri's co-defendants could have earned nearly $4 million dollars as a result of her fraudulently obtained degree.  *See* Dkt. 219 at 3; *see also* Dkt. 210-1 at 6.  It also introduced testimony that  the same co-defendant applied for a job with a $142,699.44 to $182,110.55 salary based in part on her putative degree.  *See* Dkt. 340 at 32:8–11, 34:21–24.

**REPLY BRIEF ISO DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM**

1  were uncontested.  Because that pay bump was not cumulative, it would have replaced or mooted—

2  rather than supplemented—the 2.5% pay raise awarded for the Bachelor's degree.  *See* Dkt. 338 at

3  31:11-32:7, 42:4–8.

4        The government notes that the City of Antioch offered police officers "up to $800 per year

5  in educational expenses" (Dkt. 434 at 3:7–8 ) but fails to acknowledge that Mr. Amiri did ***not*** seek

6  to recoup the over $5,000 in tuition payments he made to California Coast University from 2015 to

7  2018.  *See* PSR ¶ 22; *see also* Dkt. 338 at 39:10–18.  That Mr. Amiri did not seek reimbursement of

8  his tuition payments squarely contradicts the government's gratuitous assertion that, "[a]t some

9  point, [he] began to enjoy breaking the law."  Dkt. 434 at 2:11–12.

10       Given the evidence and Probation's calculation of the loss amount, both of which are

11 undisputed, the Court should ignore the government's insinuation that there were tens of thousands

12 of dollars in theoretical potential losses.  To be sure, the fact that the loss to the City and the gain to

13 Mr. Amiri were small in no way excuses his conduct.  But in considering 18 U.S.C. § 3553(a)(1),

14 (2)(a), the Court should be guided by the "nature" and "seriousness" of the offense conduct.

15           **3.      The Government Disregards Personal History & Post-Offense**
                        **Rehabilitation Efforts that Call for a Below-Guidelines Sentence**
16

17       The government contends that a 97-month sentence is necessary because Mr. Amiri was "an

18 officer who was systematically looking to harm people" and expresses skepticism of Mr. Amiri's

19 statements otherwise to Probation.  Dkt. 434 at 10:26–28.  Putting aside Mr. Amiri's own statements,

20 there is ample evidence in the dozens of character letters filed on his behalf refuting the

21 government's characterization of Mr. Amiri as "among the worst" police officers.  *Id.*  In particular,

22 other officers who worked with, supervised, or observed Mr. Amiri in the field uniformly noted the

23 care and compassion he demonstrated in policing the community in which he grew up.[6]  Even after

24

---

25 [6] *See, e.g.*, Dkt. No. 432-2 at 92 (City of Brentwood Police Officer: "I enjoyed working with him

26 any chance I could.  I clearly remember being excited to hear his voice on the radio when our shifts
   aligned.  I learned much from Morteza's drive as an officer, and can still remember his willingness

27 to teach our crews about cultural norms within our Middle Eastern communities and how best to
   respect their beliefs and customs within their homes."); Dkt. No. 432-2 at 23 (Ltr. No. 14 at 2)

28 (Retired Antioch Police Department Officer; Former President of Antioch Police Officers'

**REPLY BRIEF ISO DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM**

1  Mr. Amiri was indicted, lost his job, and started a new real estate business in the East Bay, his

2  colleagues have observed warm, amicable interactions between Mr. Amiri and citizens whom he

3  had arrested during his time as an officer.[7]

4          The government's recommendation of a 97-month custodial sentence also pays short shrift

5  to the well-documented efforts that Mr. Amiri has made over the last two years to rehabilitate, which

6  U.S. Probation recognized in recommending a below-Guidelines sentence.  *See* PSR at 39.  These

7  efforts and the positive results, including a perfect pre-trial services record, are detailed at length in

8  Mr. Amiri's sentencing memo.  *See* Dkt. 432 at 33–37.

9              **4.    The Government Ignores Mr. Amiri's Remorse and Accountability for
                       the Offense Conduct**

10

11          The government asserts that Mr. Amiri "has accepted no actual responsibility for his

12  actions."  Dkt. 434 at 8:17.  That is simply untrue.  As detailed in the PSR, Mr. Amiri accepted

13  responsibility for the offense conduct.  *See* PSR ¶ 43 ("I accept responsibility.").[8]  He has expressed

14  sincere remorse for the injuries that Mr. Arroyo sustained and for the negative impact his conduct

15  in both cases has had on his community.  *See id.* at 15.  He has further acknowledged that he

16

17  Association: "Morteza had consistently shown a commitment to the community and was actively
18  involved in various volunteer activities at the police department, i.e., H[a]llowe[e]n events, adopt a
    family event, and any other event sponsored by the police department that was for the community.");
19  Dkt. 432-2 at 26 (Retired Antioch Police Department Officer: "Morteza routinely took the time to
20  listen to and understand the victims of crimes and provide them with a level of service that went
    beyond basic law enforcement.").

21  [7] *See, e.g.*, Dkt. 432-2 at 49 (Ltr. No.  29 at 2) (recounting how an individual that Mr. Amiri arrested
22  on multiple occasions approached Mr. Amiri "like they were old friends" and "shared that while
    most officers had treated him with rudeness or aggression, 'Teza' had always shown him respect
23  and compassion"); *Id.* at 74 ("On a few occasions, we ran into individuals Mr. Amiri had previously
    arrested during his time with the Antioch Police Department. One particularly memorable encounter
24  occurred when two males approached us in a parking lot.  Initially, I assumed they had malicious
    intent, considering Mr. Amiri's profession and recent headlines. To my surprise, the interaction was
25  entirely cordial.  They engaged in small talk, asked how he was doing, and one of them remarked,
26  'Man, with everything going on, I just wanna give you a hug. Can I give you a hug?'—and he did.").

27  [8] In light of Mr. Amiri's responses to questions concerning his acceptance of responsibility (PSR at
28  14–16), Mr. Amiri objects to U.S. Probation's conclusion that Mr. Amiri has not "clearly
    demonstrated acceptance of responsibility for the offense" conduct.  PSR ¶ 66.

1    "violated the public's trust and contributed to negative public perceptions of local law enforcement."

2    *Id.*

3         The government contends that Mr. Amiri "deflects from his financial fraud on the City of

4    Antioch by pointing to others who had allegedly done the same." Dkt. 434 at 10:14–15. Not so.

5    Mr. Amiri has, without qualification, owned up to making the "horrible" and "wrong" decision to

6    apply for a pay increase based on a Bachelor's degree that he hired a friend to complete. PSR at

7    14–15. Insofar as Mr. Amiri refers to an Antioch Internal Affairs sergeant confiding in Mr. Amiri

8    that the sergeant had enlisted his wife to complete his college coursework, he did so not to excuse

9    his conduct but rather to explain how, at the time of his offense conduct, he tried to justify it to

10   himself. *See id.* at 16. He fully understands today that similar conduct by others does not make his

11   conduct right and that he is responsible for the wrong choices that he made with respect to his

12   education and employment. *See id.*

13        **5.     Grouping Does Not Support the Imposition of a Higher Sentence**

14        The government contends that Mr. Amiri's sentence should be within the Guidelines range

15   because, as a result of the grouping rules under U.S.S.G. § 3D1.4, his "defrauding of the public

16   coffer in Antioch . . . falls out of the Guidelines calculation." Dkt. 434 at 9:14–16. Section 3D1.4(c)

17   requires the Guidelines calculation to "[d]isregard any Group that is 9 or more levels less serious

18   than the Group with the highest offense level." Any group of counts that meets this criterion cannot

19   "increase the applicable offense level" for purposes of calculating the advisory Guidelines range.

20   *Id.* However, it "*may* provide a reason for sentencing at the higher end of the sentencing range for

21   the applicable level." *Id.* (emphasis added). In light of the mitigating factors enumerated at length

22   in Mr. Amiri's Sentencing Memorandum (Dkt. 432 at 3–18, 25–34), and U.S. Probation's

23   recommendation of a sentence nearly 40% below the government's requested sentence of 97

24   months, the Court should not exercise its discretion in this way.

25        Here, the undisputed total offense level for the wire fraud counts is nine, which corresponds

26   to a sentencing range of four to 10 months. *See* PSR ¶¶ 46–52.[9] The government contends that a

27

28   [9] *See also* U.S. Sentencing Comm'n, 2024 Guidelines Manual Annotated, Chapter 5 Part A,

**REPLY BRIEF ISO DEFENDANT MORTEZA AMIRI'S SENTENCING MEMORANDUM**

97-month custodial sentence—37 months longer than Probation's recommended sentence of 60 months—is necessary to ensure that Mr. Amiri's sentence "appropriately accounts for" the wire fraud conduct. Dkt. 434 at 9:8–9. Adding this time to Mr. Amiri's sentence to account for the wire fraud conduct would create a significant sentencing disparity between Mr. Amiri and his co-defendants, who were convicted of the same wire fraud counts and received substantially lower sentences than the incremental increase proposed by the government.[10] It would create a further disparity between Mr. Amiri and Mr. Berhan, who, in addition to a wire fraud conviction, also was convicted of possession with intent to distribute anabolic steroids, but the government did not similarly argue that he should receive a heighted sentence under section § 3D1.4(c). *See* Dkt. 354 (noting offense level of eight for anabolic steroids grouping).

The government's argument disregards that Mr. Amiri has and will continue to suffer life-changing personal and professional consequences for his offense conduct in the 264 Case, including the loss of a career that he worked his whole life to achieve. *See* Dkt. 432 at 31–33. And as the government acknowledges, shortly after his conviction in the 264 Case, and well in advance of sentencing, Mr. Amiri deposited $10,526 into the Court's Registry to pay victim restitution to the City of Antioch. *See* Dkt. 434 at 11:7–8; *see also* Dkt. 411. In light of these factors, a 97-month custodial sentence is plainly much "greater than necessary" to achieve "just punishment" for the wire fraud offense conduct, in contravention of 18 U.S.C. § 3553(a).

---

Sentencing Table, *available at* https://www.ussc.gov/guidelines/2024-guidelines-manual/annotated-2024-chapter-5.

[10] *See* Dkt. 157 (no prison term for Defendant Peterson, who received $3,207 in educational incentive pay and $800 in tuition reimbursements for a total of $4,007 (*see* Dkt. 340 at 118:16–119:2)); Dkt. 375 (30-month prison term for Defendant Berhan, who received $16,138 in educational incentive pay and $5,142 in tuition reimbursements for a total of $21,280 (*see* Dkt. 340 at 114:2–23)); Dkt. 380 (three-month prison term for Defendant Mejia-Orozco, who received $6,835 in educational incentive pay and $4,643 in tuition reimbursements for a total of $11,478 (*see* Dkt. 340 at 117:3-17)); Dkt. 408 (three-month prison term for Defendant Rodriguez Jalapa, who applied for $4,250 in tuition reimbursements (*see* Dkt. 394 at 3:23–24)); Dkt. 419 (three-month prison term for Defendant Theodosy, who received $9,608 in educational incentive pay and $2,700 in tuition reimbursements for a total of $12,308 (*see* Dkt. 338 at 115:19–116:8)).

III.    **CONCLUSION**

For the reasons stated in Mr. Amiri's Sentencing Memorandum and above, Mr. Amiri respectfully submits that his custodial sentence should be no greater than 48 months.

DATED:  June 18, 2025                COBLENTZ PATCH DUFFY & BASS LLP


By:  _____/s/_____
TIMOTHY P. CRUDO
Attorneys for Defendant
MORTEZA AMIRI
(Case No. 4:23-cr-00264-JSW)

DATED:  June 18, 2025                GOYETTE, RUANO & THOMPSON, INC.


By:  _____/s/_____
JANELLE F. CRANDELL
PAUL Q. GOYETTE
Attorneys for Defendant
MORTEZA AMIRI
(Case No. 4:23-cr-00269-JSW)